[Cite as *State v. Clark*, 2014-Ohio-5704.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2013-T-0106** |
| RICHARD A. CLARK, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas, Case No. 2013 CR 225.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor, and *LuWayne Annos*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Michael A. Partlow*, 112 South Water Street, Suite C, Kent, OH 44240 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1} This appeal is from the Trumbull County Court of Common Pleas. A jury found Richard A. Clark guilty of aggravated murder, a first degree felony in violation of R.C. 2903.01(B)&(F) and aggravated robbery, a first degree felony in violation of R.C. 2911.02(A)(1)&(C). The trial court sentenced Clark to life without the possibility of parole for the aggravated murder and a consecutive sentence of 10 years for the aggravated robbery. Clark appeals claiming that his convictions are against the

manifest weight of the evidence and that the trial court abused its discretion in admitting various photographs. For the following reasons, we affirm.

{¶2} Crystal Davis, a friend of the victim Dwyane Hickman, testified that she knew Hickman through her boyfriend Brian Bayless. According to Davis, Hickman lived on Williamsburg St. with his mom until she died. At some point, Hickman got into a motorcycle accident, suffered from a gunshot wound and a stroke, which made it difficult for him to walk and open items. Therefore, Davis along with other family members checked-in on Hickman from time to time. Davis visited him about twice a week. In March of 2013, Davis received a telephone call from Richard Clark who wanted some tattoo equipment from Bayless; however, Davis informed Clark that Bayless had already gotten rid of the equipment. Davis testified that she was aware that Clark was living with Hickman in March of 2013.

{¶3} On March 20, 2013 at around 9:15-9:30 PM, Davis arrived at Hickman's house and saw Hickman's white Malibu in the driveway. She testified that Clark opened the house door for her. Davis described Clark as wearing a tan sweater and jeans, which made Clark look "preppy." Davis testified that she was surprised by his appearance because Clark sounded like a "gangster type" or "thug type" on the phone when they spoke. When Hickman left the common area to use the restroom, Davis testified that Clark remarked "he would not want to live like that." Upon Hickman's return, Davis gave $30 and a pack of cigarettes to Hickman for allowing her and Bayless to store items at Hickman's house. Davis testified that Clark was present when she gave the money to Hickman. Davis left Hickman's house saying that she would call tomorrow.

2

{¶4}  On March 21, 2013, Davis went to check on Hickman but she did not see his white Malibu in the driveway there.  When she called Hickman she got no answer.  She told Brian Bayless about her lack of contact with Hickman.  Davis testified that she went to check on Hickman's house everyday from March 21–24 and did not see Hickman's car there.  She testified that from March 21-24 she called Hickman around 20 times.

{¶5}  On cross-examination, Davis denied comparing notes between herself and Bayless as to what they witnessed before each of them talked to the police.  She also noted that Clark was wearing jeans and nice shoes and that it was "a little dark" in the living room on March 20.  She could not remember how long she was in the house and could not remember what shirt Hickman wore.  At trial, the tan sweater that Clark supposedly wore on the 20th had a reddish-brown substance that appeared to be blood.  However, Davis admitted that she did not know if the red stains on the sweater were blood or if the stains were blood, how the alleged blood got there.  She also testified that she did not see any rifles in the house and that when she stopped by the house on March 21-24 she did not look inside the windows.

{¶6}  Brian Bayless, the boyfriend of Crystal Davis and friend of Hickman's, testified next.  Bayless testified that Hickman had lots of medical problems, had suffered a stroke and had difficulty walking.  He testified that Hickman lived on Williamsburg St. in Warren and that Hickman drove a white Malibu.  According to Bayless, he visited Hickman 3-4 times a week.  Bayless further testified that he knew Clark was interested in buying tattoo equipment and Bayless had seen Clark at Hickman's house previously.

**{¶7}** On March 20, 2013 at around 6-8 p.m., Bayless went to Hickman's house. Bayless testified that Clark was there and Clark was wearing a tan sweater and an orange Harley-Davidson hat. Finally Bayless testified that Hickman always had a pistol around him and had an assault rifle near his bed.

**{¶8}** On cross-examination, Bayless testified that he did not see Clark and Hickman argue and he testified that the police did not take a DNA sample from him. Bayless also testified that that he did not know if Hickman let someone borrow his car. Bayless also testified that after the last time he spoke to Hickman, he called Hickman for several days and did not receive an answer, which caused Bayless concern. Finally, Bayless testified that he did not know how Hickman died, when he died or who killed him.

**{¶9}** On re-direct Bayless testified that he was concerned when he could not contact Hickman because it was routine for him to stop by. He also testified that Hickman did not like other people using his things. Furthermore, Bayless testified that when he assisted the police perform a welfare check on March 25, 2013, he did not move any items or touch anything. Bayless also testified that he did not know who Melody McGlothin was and that he did not bring any items to her house.

**{¶10}** Officer Dave Weber, a police officer for Warren, testified next. He testified that he was working on March 25, 2013 and was dispatched to Hickman's house on Williamburg St. ("Williamsburg house"). Specifically, Officer Weber was dispatched to perform a welfare check on Hickman. Officer Weber testified that when he arrived, Bayless and Cathy Orwig, who was Hickman's sister, were there. According to Officer

Weber, he did not see a 2001 Chevy Malibu in the driveway. Officer Weber recalled that Bayless expressed concern over the vehicle's absence.

{¶11} Officer Weber testified that the first step in performing a welfare check was to locate an entry point. Upon not seeing any easy entry point, Officer Weber received Orwig's permission to break a window and enter through the back door. At some point, Officer Weber made his way to the front door and noticed that there were footprints there. He testified that his investigation would show the same footprint was present at other doors in the neighborhood, which led him to conclude the footprints belonged to the mailman. Officer Weber testified that there were no footprints near the backdoor.

{¶12} Officer Weber eventually reached the upstairs bathroom where he saw a body covered in blood around the upper torso and head. Officer Weber testified at that time it was clear that the person was dead and the odor of death was unmistakable. Bayless would confirm that the person was Hickman. Upon leaving the house, Officer Weber noticed that the front door had pain scrapings that appeared to be evidence of a prior break-in. However, Officer Weber did not think it was a recent break-in because there were no pieces of wood from the door jamb on the floor.

{¶13} On cross-examination, Officer Weber testified that it was obvious Hickman was dead because there was lots of blood and his hand was in an awkward position. Officer Weber further testified that Orwig did not enter the house. Officer Weber also testified that he did not believe the house was recently broken into because there were no remnants of the door jamb stuck in between the front door and storm door. Finally Officer Weber testified that he did not know how or when Hickman died.

{¶14} Sergeant Gary Riggins, an officer with the Warren Police Department, testified next. At roll call for the afternoon shift, he testified that he told officers about a Be On the Look Out (BOLO) paper describing Hickman, his address, and his missing vehicle. Later as Sergeant Riggins was driving on Maryland St., he noticed a white car matching the description of Hickman's vehicle in a driveway. Sergeant Riggins noticed that snow was on the top of the car, and so he deduced that it must have been at the residence at least overnight. Sergeant Riggins asked for backup to be sent to the residence. Once back up arrived, Sergeant Hick knocked on the front door of the house ("Maryland house"). A woman named Melody McGlothin answered the door. Sergeant Riggins asked to speak to the driver of the vehicle in her driveway, and McGlothlin replied that she would get the driver. Shortly thereafter, McGlothlin returned saying that the police had to get in real quick. Sergeant Riggins, upon direction of McGlothlin, found Clark in a bathtub naked, moaning and groaning with his eyes glazed over. Accordingly, Sergeant Riggins ordered for an ambulance to come over.

{¶15} McGlothlin informed Sergeant Riggins that Clark was staying at her house and McGlothlin allowed Sergeant Riggins to search the room where Clark was staying. Upon looking inside the room, Sergeant Riggins saw gun boxes and hypodermic needles on the floor and a crack pipe on the dresser. He also noticed some long rifles.

{¶16} On cross-examination, Sergeant Riggins testified that the vehicle was known to be missing not stolen and that the car was in plain view in the driveway. Sergeant Riggins also testified that he became aware that Clark was diabetic and therefore may have needed the needles for injections. Sergeant Riggins also testified that he did not know how or when Hickman died.

6

{¶17} Detective Michael Stabile, an officer and crime scene analyst with the Warren Police Department, testified next. He arrived at the Williamsburg house to process the scene and collect evidence. Officer Stabile testified that when he got to the front door, he noticed the chipped paint on the front door, but the lack of wood chips indicated that this was not a fresh injury to the door. Eventually, once Officer Stabile reached the living room, he encountered a garbage bag containing what appeared to be a tan sweater with red stains on it. Upon further examination, Officer Stabile discovered the bag also contained a rag wrapped around a knife and several used 12 oz. soda cans.

{¶18} Officer Stabile testified that the red stains on the tan sweater on the right sleeve and chest area showed evidentiary value because the red stains could be blood. Therefore, Officer Stabile handled all of the evidence with latex gloves. Officer Stabile also testified that the knife blade appeared to have strands of hair on it. Consequently, Officer Stabile decided that the knife handle and blade and the tan sweater should be sent to the Bureau of Criminal Investigations (BCI) for testing.

{¶19} Later on March 25, 2013, Officer Stabile is dispatched to the Maryland house where he processed the scene there, specifically the bedroom where Clark had been residing. The photographs of the scene showed a knife on a bedroom table and some hypodermic needles, tablespoons, and a cell phone on a nightstand. Officer Stabile testified that the presence of the hypodermic needles along with the other items was consistent with heroin usage. Additionally, Officer Stabile testified that he manipulated the cell phone to display that cell phone's number and took a picture of the phone displaying the number. In a closet, Officer Stabile found several gun cases for

rifles. Another photograph shows an orange Harley-Davidson hat hung on a wall-hanger in the bedroom. Finally, next to the bed, Officer Stabile discovered jeans which had a reddish stain on a pant leg that appeared to be blood. Because the jeans appeared to contain evidentiary value, Officer Stabile handled this evidence with latex gloves.

{¶20} Additionally, Officer Stabile recovered several guns at the Maryland house. Because the guns were deemed to have evidentiary value, Officer Stabile handled these weapons with latex gloves. One gun was a HiPoint .380 semiautomatic handgun with a clip and bullets, which had a serial number of P835734. This gun was found in Clark's bedroom. The next gun, a New England Firearm Model No. 581 was found in the closet of Clark's bedroom; its serial number was NG328130. A third gun, an Izhmash Saiga Model 223 was found in the same closet; its serial number was H06163824. Finally a fourth gun, a Remington Model 760 with a serial number 48579[1] was found in the same closet as the other guns. Engraved on the handle of the Remington 760 was a basket weave inlay with some grass.

{¶21} Later on, Officer Stabile towed the white 2001 Chevy Malibu to a secure location where it could be processed. Upon searching the vehicle, Officer Stabile found an insurance card with Hickman's name on it and Hickman's wallet. Officer Stabile testified that he did not find any money in the wallet; however he did find credit cards and a food stamp card with Hickman's name on it.

{¶22} Finally, after learning that Clark would survive his heroin overdose, Officer Stabile went to the hospital and obtained Clark's consent for a DNA sample.

---

1. The record is inconsistent on the exact serial number. At a later time, Officer Stabile testified the serial number for this gun was 481579, to the prosecution confirmation question regarding whether the number was 48579.

{¶23} On cross-examination, Officer Stabile testified that his job was strictly to preserve evidence. He further testified that he did not wear "booties" at either residence, but that he did use several gloves when processing evidence. He could not remember if either scene was taped off with police tape.

{¶24} As to the rag surrounding the knife found at the Williamsburg house, Officer Stabile testified that the rag was wet when he touched it, that the rag had probably touched all of the items in the bag. Officer Stabile testified that the rag and the knife were not bagged separately. Officer Stabile testified that he did not believe he preserved the coke cans found in the bag containing the sweater with the rag. Officer Stabile also could not remember if he changed gloves every time he removed an item from the bag; however he did testify that he put all of the items that were to be sent for testing in a paper bag to prevent mold growth. Finally, he did not know if there might have been blood on the rag.

{¶25} In regard to whether there was a recent break-in at the Williamsburg house, Officer Stabile admitted that he had no qualifications to determine whether the damage to the door was fresh.

{¶26} In regard to items found at the Maryland house, Officer Stabile admitted that just because Hickman's belongings were found in a wallet does not mean the wallet belonged to Hickman. Officer Stabile also testified that he did not know how the weapons found at the Maryland house ended up there. Officer Stabile further testified that he did not test the orange Harley-Davidson hat or the wallet for DNA.

{¶27} Finally, Officer Stabile testified that he had no firsthand knowledge of how Hickman was killed, when he was killed or who killed Hickman.

{¶28} On re-direct, Officer Stabile testified that he did not put the items found in the bag at the Williamsburg house inside the bag. He also testified that it was possible that because the bag (containing the rag, sweater and knife) was plastic, that would explain why the rag was damp. Officer Stabile also testified that nothing in the wallet indicated the wallet belonged to anyone else. Officer Stabile further testified that he did not send every possible item for testing because he has to make decisions about what he tests.

{¶29} On re-cross, Officer Stabile testified that he did not send the rag that encompassed the knife in for testing.

{¶30} Melody McGlothlin, the owner of the Maryland house, testified next. She testified that she knew Clark through a friend because she wanted to get a tattoo done. She testified that on the afternoon of March 25, 2013 the police came to her door and asked about the vehicle in her driveway. She replied that it had been there for 3-4 days.

{¶31} McGlothlin testified that she provided Clark with a room to stay even though Clark did not pay rent there. She testified that Clark usually walked over to her house, and that she had never seen the vehicle parked in her driveway before. McGlothlin testified that Clark told her a friend let him borrow it.

{¶32} McGlothlin testified that when the police asked her to get Clark, she went to the bathroom and found him in a tub and yelled for help. McGlothlin testified that the police called for an ambulance and that Clark was carted off. After that, McGlothlin gave consent for the police to search her house. McGlothlin testified that she did not go into Clark's room very much or into his closet.

{¶33} After being shown the four firearms that Officer Stabile previously testified to, McGlothlin stated that she had never seen any of those firearms before. Because some of the firearms were rifles, McGlothlin testified that she would have noticed if some of those firearms were in her house. She testified that she had a policy of not having guns in the house because of her concern for her safety as well as her children's safety. Additionally, McGlothlin testified she did not recognize the hypodermic needles, tablespoons and cigarette lighters that Officer Stabile testified were consistent with heroin use. She also did not see Clark use the blue cell phone on the nightstand. After being shown a picture of what appears to be firearm cases in the closet in her bedroom, McGlothlin testified that she did not know how those cases got there. Finally, McGlothlin testified that after Clark was taken in an ambulance, she noticed that the screen to the window in Clark's bedroom was removed and laying on the ground outside. McGlothlin testified that she did not remove the screen and that the screen was too high for her young children to remove it.

{¶34} On cross-examination, McGlothlin admitted that because she uses glasses she has a problem with her vision. She also admitted that she did not know Clark's last name when she let him stay at her house. She testified that she would not let her children "hang out" with Clark when he was at the house. McGlothlin further testified that she would never leave the children alone with Clark, but that her kids would have some contact with Clark. She also testified that she knew Clark was a diabetic but was nevertheless unaware of the needles in the bedroom. McGlothlin further testified that she did not see Clark take the screen off the window, and that no other screens in her house were missing. McGlothlin testified that she did not see any

footprints outside of Clark's bedroom window and that she did not believe that the police conducted any testing on the screen. Finally, in her recorded statement to the police McGlothlin acknowledged that she previously stated that she did not do drugs; however, on the stand, she admitted that she smoked marijuana. According to McGlothlin, when the police questioned her, she thought the police were only asking about drugs that were injected.

{¶35} On re-direct, McGlothlin testified that she did not know Hickman, Bayless or Davis and she did not know how any property belonging to any of those persons would get into her house.

{¶36} On re-cross, McGlothlin testified that she did not know what happened to Hickman the night he was killed.

{¶37} On further re-direct, McGlothlin testified that she did not know how the jeans with Hickman's blood on it would be found in her room.

{¶38} Cathy Orwig, Hickman's sister, testified next. She testified that Hickman had medical problems that made it hard to move around, and that she would check on Hickman once or twice a week. She testified that Hickman lived at the Williamsburg house, possessed a white Malibu and would not go on vacations for four or five days.

{¶39} Orwig then testified that her father possessed a firearm with a distinctive basket-like engraving on the handle and that this firearm had been passed down to Hickman. According to Orwig, Hickman possessed the firearm at the Williamsburg house. Upon being shown the same firearm that Officer Stabile identified as a firearm with the basket weave inlay, Orwig identified that firearm as her father's firearm.

**{¶40}** Orwig then testified that she went to Hickman's house on March 25, 2013 because she was concerned by Hickman not returning her phone calls. Orwig testified that when she arrived, Brian Bayless and the police were at the house and Hickman's car was not there. Because Orwig did not have a working key to the house, Orwig testified that they broke a window to get into the house.

**{¶41}** Orwig then identified that the blue cell phone recovered at the Maryland house belonged to Hickman. She made this identification by being shown a picture of the cell display of the phone number belonging to that phone. Orwig also testified that James Earl Hickman was her older brother and that Shirley Lea Ball was her mother. Orwig further testified that she did not know Clark or see him at the Williamsburg house, but she did know that Hickman would let people stay at his house from time to time. Orwig also testified that she did not know Melody McGlothlin. Finally, Orwig testified that Hickman would not let other people drive his car.

**{¶42}** On cross-examination, Orwig testified that she last saw Hickman on March 13, 2013, and that between March 13-25 she drove by Hickman's house occasionally. She testified that she did not go inside the house with the police, and that she did not know if the police talked to any of Hickman's other friends. Orwig testified that she did not know if Hickman drove to "swap meets" or if Hickman owed anyone money. Orwig further testified that she did not know of any prior break-ins to the house or why Hickman carried guns in his house. Finally, Orwig testified that she could not say for certain whether Hickman would loan his car out to someone.

**{¶43}** Phillip Russell, a supervisor at the Bureau of Alcohol, Tobacco and Firearms (ATF) National Tracing Center, testified next. His testimony largely consisted

13

of authenticating various documents that identified the ownership of various firearms that Officer Stabile collected at the Maryland house. Collectively, these tracing records show the following: (1) the HiPoint CF380 .380 caliber firearm had a serial number of P835734 and was purchased by Shirley Lea Ball, (2) the Harrington and Richardson 1871 .410 caliber firearm had a serial number of NG328130 and was purchased by James Earl Hickman, (3) the Izhmash Saiga .223 caliber firearm had a serial number of H06163824 and was purchased by Hickman, and (4) the Remington Arms Company 760 .30-06 caliber firearm had a serial number of 481579. Russell testified because the Remington 760 was purchased before the Gun Control Act of 1968, there was no purchaser information on the firearm.

{¶44} On cross-examination, Russell testified that he did not have firsthand knowledge of the information of what was on the documents. He also testified that there is no information on any private sales of guns between individuals. Therefore, Russell conceded it was possible that the HiPoint CF380 did not belong to Hickman.

{¶45} On re-direct, Russell also acknowledged that it was possible that the HiPoint CF380 belonged to Hickman.

{¶46} Lindsey Prunski, a forensic scientist employed by BCI's biology section, testified next. Her testimony largely consisted of admitting a document indicating whether the tan sweater and knife recovered at the Williamsburg house and the jeans recovered at the Maryland house contained blood on them. The BCI document indicates that the samples taken from the clothes all revealed a presumptive positive test for blood.

{¶47} On cross-examination, Prunski testified that the government pays BCI. Prunski testified that she did not have experience as a crime scene investigator and that she did not know how the items were collected and which items were sent for analysis. Prunski testified that when she received the items, none of them were moist or moldy. Prunski further testified that presumptive testing was a screening procedure used for bodily fluid analysis to indicate whether a bodily fluid was present. She testified that her lab performs confirmatory tests only in cases where there is reason to believe animal blood might be present. Prunski also testified that animal blood, certain body tissue and bleach can cause a false positive test for blood; however, she also testified that BCI uses two reagents to help color code when a false positive test for bleach has occurred. Prunski testified that the blood she recovered could have been animal blood. Prunski also testified that the hair found on the blade of the knife was not tested. Prunski also testified that she tested the handle of the knife for blood not the whole knife. Prunski further testified that two stains on the pair of jeans collected presumptively tested negative for blood and that she did not know what those items were.

{¶48} On re-direct, Prunski testified that a presumptive test for blood indicates that blood is present, but when a DNA analysis indicates there is no human DNA a confirmatory test for human blood is performed. Prunski testified that she was not requested to perform a confirmatory test. She also testified that if a sample tested positive for DNA, it is known that the sample does not contain animal blood.

{¶49} Stacey Violi, a forensic scientist in the DNA section of BCI, testified next. At the beginning of her testimony, she acknowledged that she was paid by the state,

15

but also works on DNA exoneration cases for the wrongfully convicted. However, her testimony largely consisted of admitting the document containing the results of the DNA tests performed on the samples provided by Prunski. That report contains the following information.

{¶50} The partial DNA profiles from the swab from the stain on the knife blade and two swabs from the stain on the knife handle, as well as a sample of a red stain on the sweater were consistent with Hickman's DNA profile. The DNA profile from the cutting of the sweater tag, and the swab from the neck area of the sweater were mixtures; the major profile was consistent with contributions from Clark, minor profiles were consistent with Hickman, and a partial minor profile was consistent with one unknown source. The DNA profile from the swab from the stain on the jeans was a mixture. The major profile was consistent with Hickman, while the partial minor profile was consistent with Richard Clark.

{¶51} The conclusions drawn from this information were as follows. Hickman could not be excluded as the source of the DNA from the knife and the cutting from the stain on the sweater and as a major source of DNA from the swab from the stain on the jeans. Based upon computer calculations provided by the FBI, the expected frequency of occurrence from the stain on the knife blade is 1 in 1.219 sextillion unrelated individuals. As for Clark, he was excluded from the source of DNA from the knife or the cutting from the stain on the sweater; however he could not be excluded as the major source of the DNA from the cutting from the sweater tag and the swab of the neck area of the sweater. Based upon the computer calculations from the FBI, the expected

frequency of occurrence of the major DNA profile from the cutting from the sweater tag and the swab of the neck area of the sweater is 1.41 septillion unrelated individuals.

{¶52} Finally, Violi testified that it was possible for someone to touch something and not leave DNA on the item.

{¶53} On cross-examination, Violi testified that it was possible that someone holding a knife tightly and being sweaty could increase the chance of DNA being left on the knife. She also testified that she had no discretion as to what items from a scene are tested and she did not know how DNA got on these items or how long it was there. Violi also testified that dirty unkempt homes could increase the chances of DNA being left on an item; however, she questioned whether current DNA testing methods could detect that sort of DNA. Violi testified that her DNA tests were limited by the quality of the sample provided to them. She also testified that certain parts of the loci being tested from Hickman could not be detected, which lowered the probability of finding an unrelated individual with the same DNA profile. She also testified that if an item was wet, that could increase the possibility of a DNA transfer to the item. Violi also testified that if two people wore the same shirt, there might be multiple DNA profiles on that shirt and that if there were multiple DNA profiles present, there was no way to tell who wore the shirt last. She further testified that the fact that the knife, handle, blade, and sweater were all found in one bag could be contaminated by virtue of rubbing together. Violi also testified that the fact that drunk 12 oz. soda cans being found in the bag would increase the chances of a DNA transfer from the soda can to other items in the bag.

**{¶54}** On re-direct, Violi testified that if DNA is taken from a blood sample and there is a major contributor to that DNA, the blood most likely came from the major contributor.

**{¶55}** On re-cross, Violi testified that it was possible that none of the DNA samples on the tested items were from a person's blood.

**{¶56}** Detective John Greaver with the Warren Police Department and lead detective on this case, testified next. His testimony on direct examination largely consisted of delegating tasks to the other members of the police department at the Williamsburg house and Maryland house. He also took the statements of Bayless, Orwig, McGlothlin, and Daniel Pigg, McGlothlin's husband.

**{¶57}** On cross-examination, Detective Greaver testified that he spoke with Orwig and Bayless for about five to ten minutes and that both witnesses acted concerned over Hickman's lack of contact with friends and family. Detective Greaver also testified that Detective Stabile made decisions over what should be tested. Detective Greaver was aware that a lockbox was opened at the Williamsburg address but did not know what the contents were, if the lockbox or content thereof were tested, and why no testing was performed. He also testified that he did not know if Bayless was swabbed, if Bayless' fingerprints were on the front door of the Williamsburg house, and that he did not believe the guns recovered at the Maryland house were tested. Detective Greaver also testified that he did not recommend that the wet rag found with blood[2] recovered at the Williamsburg house should be tested. He also did not know why the orange Harley Davidson hat was not tested. Detective Greaver also did not

---

2. Detective Greaver disputed defense counsel's suggestion that there was blood on the rag; however Detective Greaver conceded that there was a possibility that blood was on the rag.

18

have personal knowledge of how the recovered guns got into the Maryland house, and he did not know why Hickman's credit cards were not used. Finally, Detective Greaver did not know if fingerprints were taken from the white Malibu.

{¶58} Finally, Dr. Humphrey Don Germaniuk, the Coroner for Trumbull County, testified. Dr. Germaniuk testified that he became informed that Hickman died under suspicious circumstances on March 25, 2013 at approximately 11:00 a.m. Dr. Germaniuk testified that his speculative examination of the body at the scene revealed that "this was a sharp force injury case." Dr. Germaniuk also testified that Hickman was just coming out of rigor mortis which indicated that the time of death was sometime between 24-72 hours. An autopsy was performed the next day.

{¶59} The autopsy revealed that Hickman suffered 11 stab wounds and 4 incisions from his attacker. The state used 12 exhibits (i.e. photographs) to show the nature of the stab wounds and incisions. Although Dr. Germaniuk went into extensive detail describing the nature of Hickman's stab wounds and incisions, for our purposes, it is sufficient to say the injuries are gory. Furthermore, Dr. Germaniuk testified that the presence of skin slippage confirmed that Hickman was dead for longer than 24 hours. Dr. Germaniuk also testified that his tests suggested that the blade of the knife or weapon that killed Hickman was at least 4 and 3/4 inches long, and that the knife found at the crime scene could have been the weapon used to injure Hickman. Dr. Germaniuk also testified that because Hickman's wounds were all on the left-hand side of his body, this suggested that the attacker was right-handed. He further testified that finding blood on the sleeve of the attacker's shirt and pants would be consistent with these injuries. Dr. Germaniuk also testified that THC and an antidepressant were

found in Hickman's toxicology report. Finally, Dr. Germaniuk testified that he ruled the cause of death to be multiple stab wounds and the manner of death to be a homicide.

**{¶60}** On cross-examination, Dr. Germaniuk testified that the presence of an antidepressant in Hickman suggested that death occurred 24-48 hours before he was discovered. He also testified that blood would not necessarily squirt out from a lethal blow, and that the mild decomposition suggested the body had recently died. Finally, Dr. Germaniuk testified that he did not know if the red stains on the tan sweater were blood and if the red stains were blood, how that blood got on the sweater.

**{¶61}** On re-cross, Dr. Germaniuk testified that he did not find a cell phone, keys or wallet on the victim, and that he was not present for prior testimony about whether the sweater stains were blood. Finally, Dr. Germaniuk said it was very unlikely that Hickman died at the outer edges of his 24-72 hour window for time of death.

**{¶62}** As his first assignment of error, Clark alleges:

**{¶63}** "The trial court erred and abused its discretion, to the prejudice of the appellant, by admitting State's exhibits 36 through 47 over the objections of the appellant."

**{¶64}** Within this assignment, Clark argues that the photographs of the stab wounds and incisions were unfairly prejudicial because of the gory nature of the photographs. He also alleges that the photographs are overly cumulative; however, he provides no other support for his argument. The state responds that the photographs are not unduly prejudicial because the nature of the attack was brutal and that depicting such brutality to the jury was necessary to establish its burden to show that Clark purposefully killed Hickman. The state also alleges that the state narrowed down

20

the number of photographs to the bare minimum necessary to sustain their burden of proof. In the alternative, the state argues that admission of the photographs was harmless error.

{¶65} An appellate court reviews the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Davis v. Killing*, 171 Ohio App.3d 400, 2007-Ohio-2303, at ¶11 (11th Dist.), citing *Calderon v. Sharkey*, 70 Ohio St.2d 218 (1982). An "abuse of discretion" is a term of art, connoting judgment exercised by a court, which does not comport with reason or the record. *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678, 3 Ohio Law Abs. 187, 3 Ohio Law Abs. 332, 148 N.E. 362 (1925). The Second Appellate District also recently adopted a similar definition of the abuse-of-discretion standard: an abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶62, quoting Black's Law Dictionary (8 Ed.Rev.2004). When an appellate court is reviewing a pure issue of law, "the mere fact that the reviewing court would decide the issue differently is enough to find error[.] * * * By contrast, where the issue on review has been confined to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error." *Id.*, ¶67.

{¶66} Evid.R. 403(A) states: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶67} Evid.R. 403(B) states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

{¶68} R.C. 2903.01(B) in pertinent part states: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery * * *." Therefore, the state is correct that it is required to prove that Clark purposefully killed Hickman, and the photographs are relevant to demonstrating such mens rea existed.

{¶69} The photographs are not overly cumulative with other evidence; rather, the photographs are the only available evidence that show the full extent of Hickman's injuries. Although Dr. Germaniuk described the shapes and depths of the stab wounds and incisions, enabling the jury to see the stab wounds provided crucial corroboration for Dr. Germaniuk's testimony and further helped the jury understand his testimony. Furthermore, there is no merit to the suggestion that too many photographs of the injuries were admitted. Dr. Germaniuk identified 15 injuries that came from a sharp object and the state used 12 images to capture all injuries.

{¶70} Finally, this court has previously recognized that the gory nature of images in non-capital murder cases does not always result in the exclusion of the photographs. *State v. Handwork*, 11th Dist. Portage No. 2002-P-0134, 2004-Ohio-6181, ¶21-22. Here, the photographs merely depict the gruesome nature of the injuries, which is relevant to show that Clark purposefully killed Hickman. Evidence that is probative of guilt does not indicate the admission of the photographs was *unfairly* prejudicial to Clark. As the Supreme Court of Ohio explained: "Exclusion on the basis of unfair

22

prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence [that] might result in an improper basis for a jury decision." (Internal quotations and citation omitted.) *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). There is nothing that indicates the photographs were admitted to inflame the passions of the jury. Therefore, we cannot conclude that the trial court abused its discretion in admitting the photographs.

{¶71} Consequently, the first assignment of error is without merit.

{¶72} As his second assignment of error, Clark asserts:

{¶73} "The appellant's convictions are against the manifest weight of the evidence."

{¶74} First, Clark asserts that the state failed to prove that the murder and theft occurred on March 21, 2013, the date specified in the indictment on when the aggravated robbery and aggravated murder occurred.[3]

{¶75} In regard to the aggravated robbery, Clark asserts that the state's evidence fails to show that Hickman and Clark did not have some sort of arrangement where Hickman sold or otherwise consensually gave his car and guns to Clark.

{¶76} In regard to the aggravated murder, Clark claims that the absence of Clark's DNA on the murder weapon indicates Clark is innocent. Clark also asserts that his jeans could have possessed Hickman's DNA by virtue of the two living together for some period of time.

---

3. To be clear, the indictment states that the alleged crimes occurred "on or about" March 21, 2013.

23

**{¶77}** In determining whether evidence is sufficient to sustain a conviction, the reviewing court asks whether reasonable minds could differ as to whether each material element of a crime has been proven beyond a reasonable doubt. *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978). If reasonable minds could differ as to whether each material element has been proven, a Crim.R. 29 motion for acquittal must be overruled. *Id.* at 263-64. The evidence adduced at trial and all reasonable inferences must be viewed in the light most favorable to the state. *State v. Maokhamphiou*, 11th Dist. Portage No. 2006-P-0046, 2007-Ohio-1542, ¶20.

**{¶78}** In contrast, a manifest weight challenge requires the reviewing court to play the role of a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997 Ohio 52, 678 N.E.2d 541 (1997). A reviewing court should be cognizant of the fact that the jury is in the best position to assess the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus (1967). For an appellate court to overturn a conviction as being against the manifest weight of the evidence, it must be found that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. Rep. 215, 485 N.E.2d 717 (1983).

**{¶79}** The relevant portion of R.C. 2903.01(B) previously quoted, which defined certain circumstances where one commits aggravated murder, is applicable here. Furthermore, aggravated robbery under R.C. 2911.01(A)(1) is defined as "[n]o person,

in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

{¶80} Upon review, none of appellant's argument have merit. First, "[i]n a criminal charge the exact date and time are immaterial unless in the nature of the offense exactness of time is essential. It is sufficient to prove the alleged offense at or about the time charged." *Tesca v. State*, 108 Ohio St. 287 (1923), paragraph one of the syllabus. None of the element of aggravated robbery or aggravated murder contain an element where the exactness of time is essential; therefore the state only had to prove the offense took place "on or about" the time charged. Clark does not contest that the time of death, whenever it occurred, occurred on or about the date charged in the indictment. Therefore this argument is without merit.

{¶81} Secondly, although the evidence that Clark robbed Hickman (as opposed to Hickman lending his personal belongings to Clark) is circumstantial, it is not against the manifest weight of the evidence for the jury to infer guilt. Orwig testified that Hickman did not let other people borrow his car, and Bayless testified Hickman did not like other people using his belongings. Furthermore, common experience suggests that most people generally do not lend out their wallets containing their personal belongings, such as a credit card and food stamp card. Finally, there is virtually no positive proof that Hickman consensually loaned any of his belongings to Clark. Thus,

although the jury did not have to conclude Clark robbed Hickman, a conclusion that Clark robbed Hickman is not against the manifest weight of the evidence.

{¶82} Finally, Clark's protests about the DNA evidence is meritless. The combined testimony of the expert witnesses from BCI rather conclusively established that Hickman's blood was present on Clark's clothing and the murder weapon. Although the presence of an unidentified sample of DNA on the sweater perhaps suggests that someone else could have committed the murder, the jury could have concluded that the unidentified DNA came from someone else who touched the sweater, but otherwise was not present at the time of the murder.

{¶83} The second assignment of error is without merit.

{¶84} The judgment of the Portage County Court of Common Pleas is affirmed.


DIANE V. GRENDELL, J., concurs,

COLLEEN MARY O'TOOLE, J., concurs with a Concurring Opinion.


_____


COLLEEN MARY O'TOOLE, J., concurs with a Concurring Opinion.

{¶85} Upon review of the record I find the admission of the photographs of the victim's stab wounds was prejudicial and cumulative. These photographs should have been excluded under Evid.R. 403. However, as the plethora of properly admitted evidence in this case established the guilt of the defendant beyond a reasonable doubt, I would find the error harmless.