[Cite as *State v. Thomas*, 2020-Ohio-4635.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | | **CASE NO. 2019-L-085** |
| - vs - | : | |
| JOSEPH L. THOMAS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 2011 CR 000321.

Judgment: Affirmed.

*Charles E. Coulson,* Lake County Prosecutor, and *Karen A. Sheppert* and *Teri R. Daniel,* Assistant Prosecutors, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Timothy Young,* Ohio Public Defender, and *Victoria Bader* and *Addison M. Spriggs,* Assistant State Public Defenders, 250 East Broad Street, Suite 1400, Columbus, OH 43215 (For Defendant-Appellant).

CYNTHIA WESTCOTT RICE, J.

{¶1}  Appellant, Joseph L. Thomas, appeals from several judgments of the Lake County Court of Common Pleas, culminating in the judgment convicting him, after trial by jury, of, inter alia, the aggravated murder of Annie McSween. For the reasons discussed in this opinion, we affirm the judgments of the trial court.

{¶2} In 2011, appellant was indicted on four counts of aggravated murder, in violation of R.C. 2903.01(A) and (B), with death penalty specifications; three counts of kidnapping, felonies of the first degree, in violation of R.C. 2905.01(A)(2), (3), and (4); rape, a felony of the first degree, in violation of R.C. 2907.02(A)(2); two counts of aggravated robbery, felonies of the first degree, in violation of R.C. 2911.01(A)(1) and (3); and tampering with evidence, a felony of the third degree, in violation of R.C. 2921.12(A)(1). Appellant was tried to a jury, convicted, and sentenced to death and an additional 33 years on the non-capital convictions. He filed an appeal of right with the Supreme Court of Ohio and, in *State v. Thomas*, 152 Ohio St.3d 15, 2017-Ohio-8011, the Court held that the state's introduction of inadmissible, prejudicial evidence, i.e., irrelevant evidence of a knife collection appellant possessed, was plain error which necessitated reversal. The court observed:

{¶3} [T]he trial court committed prejudicial error by admitting evidence of five knives that the state knew were not used in connection with McSween's murder and that the prosecutor relied on to describe Thomas as an owner of "full Rambo combat knives" with the intent to have the jury infer that Thomas is a dangerous person of violent character. *Id.* at ¶45.

{¶4} In light of the foregoing, and because the circumstantial case against appellant was not overwhelming, the Court concluded appellant's conviction must be reversed and remanded for a new trial. The case proceeded to a second jury trial where the following facts were adduced:

{¶5} **Late night of November 25 and early hours of November 26, 2010**

{¶6} Mario's Lakeway Lounge is a bar located in Mentor-on-the-Lake, Lake County, Ohio. It is situated on Andrews Road, next to Yager's Marine, a boat repair and storage facility. Behind the bar, on Park Street, is a residence owned by Mario Cacic,

2

the bar's owner. Mr. Cacic rented the home to Margaret (f.k.a.) Huelsman and Hattie Hess, employees of the bar. On the evening of November 25, 2010, Thanksgiving, Annie McSween was a bartender at Mario's. Brian Williams, a local man, had Thanksgiving dinner with his family and later, at approximately 11:00 p.m., went to Mario's for drinks; Mr. Williams had met a bartender there previously, Ms. Huelsman, and hoped to see her at the bar. Upon his arrival, Mr. Williams recognized a few people and, around 11:30, Ms. Huelsman arrived at the bar with several friends. The two conversed for some time and, when Ms. Huelsman began talking with friends who Mr. Williams did not know, he commenced a game of pool with a white male with whom he was unfamiliar. He noted the stranger had short hair, a gap in his teeth, and had a knife clipped to his pocket. Mr. Williams stated the individual was visibly irritated because he and his girlfriend apparently broke up earlier in the evening.

{¶7} Other patrons that evening noticed what they described as a white male, who they did not recognize, with a gap in his teeth. The unknown male played games of pool and shared his agitation regarding his girlfriend with those who would listen. He awkwardly danced and expressed interest in some women. Around 1:45 or 2:00 a.m., Mr. Williams was near the male when Ms. Huelsman invited him to her Park Street residence to watch a movie. He accepted the invitation and explained to the unknown male he was leaving with Ms. Huelsman. The male commented that he wished he had a woman to join as well.

{¶8} At approximately 2:30 a.m., the only remaining patron in the bar was the unknown white male. The bar owner, Mr. Cacic, and the bartender, Ms. McSween, were the only others in the establishment. Mr. Cacic observed the man drinking a beer

3

and staring at Ms. McSween.  As she was stocking the cooler, the man went behind her, remained briefly, but returned to his stool.  Mr. Cacic advised the man it was time for him to leave. The man insisted he needed to stay and finish the beverage for which he had already paid; Mr. Cacic offered the man free beers at a later time if he left. Without speaking, the man left, and Mr. Cacic locked the door.  He advised Ms. McSween she should go home, but she insisted on re-stocking the bar for the next day. Mr. Cacic then left out a side door and went home.

{¶9}    Meanwhile, Ms. Huelsman and Mr. Williams had fallen asleep on a couch while watching a movie.  Around 4:15 a.m., Mr. Williams awoke to use the restroom.  He returned to the sofa and was watching television when he heard a sudden pounding noise on the house, like a shovel slamming on the side of the residence.  As Ms. Huelsman awakened, the pounding moved along the side of the house and then stopped.  Mr. Williams heard what he thought was the murmuring of a male voice.  They then heard the screen door handle jiggle.  The main door was slightly open and Ms. Huelsman, concerned an intruder was attempting to enter, quickly slammed it closed and locked it.  Mr. Williams observed a silhouette of a person with shoulder length hair through the front-door window and after several minutes passed, Mr. Williams went outside to surveille the house.  The night was cold and raining.  Several cars remained in the bar's parking lot, some belonging to Mr. Cacic, one to Ms. McSween, and others to residents of the house behind the bar.  Mr. Williams neither saw any potential intruders nor any obvious signs of a disturbance.

{¶10}  **The Next Morning**

4

{¶11} At approximately 8:15 a.m., on Friday, November 26, 2010, Mr. Cacic returned to the bar. He noticed the tires of several cars in the parking lot had been slashed. He walked to the Park-Street residence, where he noticed what appeared to be blood awashing areas of the side of the house and a pool of blood by the front door. He called the police and notified the occupants, Mr. Williams, Ms. Huelsman, and her roommate, Hattie Hess.

{¶12} At approximately the same time, James Yager, of Yager's Marine, the boat repair and storage facility next to Mario's Lakeway Lounge, was arriving at his place of business and noticed that two boats that had been shrink-wrapped for the season had been cut open with a knife. While inspecting the boats for additional possible damage, Mr. Yager noticed a woman's shoe and underwear in the bar's parking lot. Mr. Yager saw Mr. Cacic and greeted him. Mr. Cacic advised Mr. Yager that several vehicles had their tires slashed and, at that point, Mr. Yager noticed gravel next to one of the vehicles was disturbed and observed jewelry on the ground; it appeared, from the disturbance, that a struggle took place. He then noticed a woman's shoe in the wheel well of one of the cars. Mr. Yager then proceeded to the edge of a wooded area near the bar and observed the nude, lifeless body of Ms. McSween approximately 30 feet into the woods.

{¶13} **Coroner's Findings**

{¶14} Dr. Dan Galita, forensic pathologist and medical examiner at the Cuyahoga County Medical Examiner's Office, performed the autopsy. Ms. McSween's cause of death was sharp force trauma with a knife to the neck and back and blunt force trauma to the head. The preliminary examination revealed a large number of exterior

5

injuries including abrasions, contusions, lacerations (some from defensive wounds), fractures, and stabbings; further, her interior wounds were consistent with blunt force beating, stabbing, and raping. While all the injuries contributed to her death, certain injuries were more significant than others. Both Ms. McSween's carotid and jugular vessels were cut on her lower right throat; she suffered a subarachnoid hemorrhage on the surface of her brain. These injuries caused a significant amount of blood loss and pressure on the brain and were the most deadly. Additionally, Ms. McSween's hyoid bone, located on the anterior, frontal neck was broken, indicating extreme pressure and manual strangulation; she also suffered from a depressed fracture to her face due to blunt impact, likely from a fist. The impacts to Ms. McSween's face were of sufficient force to break her dentures, nose, jaw, and depress her entire face.

{¶15} Dr. Galita further opined Ms. McSween was most likely dragged naked from the parking lot into the wooded area; her body showed linear abrasions on the hip, upper extremities, including her arms, lower chest, and hands. Further, Ms. McSween's vagina and anus were both distended and lacerated; the abrasions and lacerations to these areas were consistent with the forced introduction of a blunt, cylindrical object. Finally, after her death, Dr. Galita concluded Ms. McSween was stabbed five times in the back; the stab wounds were delivered with such force to perforate the chest wall and certain internal organs.

{¶16} **Investigation**

{¶17} Members of the Mentor-on-the-Lake Police Department arrived and secured the crime scene. As the investigation commenced, other police departments assisted. The Lake County Crime Laboratory ("LCCL") processed evidence at the

scene. Once news of the homicide spread, many of the patrons at the bar on the night in question contacted police. Ultimately, police were able to collect DNA samples from all individuals in the bar in the hours prior to the murder, with the exception of one specific individual, i.e., a short-haired man with a gap in his teeth who was the last male patron in the establishment that night.

{¶18} While processing the crime scene, Ms. McSween's shoes, underwear, and eyeglasses were recovered. David Green from LCCL observed a potential shoe imprint near Ms. McSween's vehicle and made a plaster imprint. Ms. McSween's cell phone was recovered in a driveway within throwing distance of the bar. Ms. McSween's vehicle was swabbed for blood and DNA. The Park Street residence was photographed and searched. The blood on the house and front step, as well as bloody handprints on the side of the house and front door were photographed; a bloody trail was also observed in the woods where the body was discovered. Conspicuously, Ms. McSween's remaining clothing was missing from the scene.

{¶19} DNA samples were collected from Ms. McSween's body to test against suspects as they developed. Although police were having difficulty finding the last patron at the bar, another patron, Matt Miller, one of the individuals who played pool with the man, assisted authorities in sketching a composite. A press release was subsequently prepared by the Mentor-on-the-Lake Police Department requesting the public's help in identifying the individual.

{¶20} Meanwhile, appellant was living at the residence of Susan Gorsha on Marine Parkway, approximately a 15-minute walk from Mario's Lakeway Lounge. Also living in the home was Ms. Gorsha's daughter, Jackie Miller; her husband; and two

7

children. Ms. Miller and appellant previously worked together at Burger King. When Ms. Miller heard about the man for whom the police were looking, the description reminded her of appellant. She went to police and stated that, on Thanksgiving evening, she and her family visited her husband's family some three hours away. She further stated that, due to car trouble, they did not return home until approximately 2:00 a.m. and appellant was not home when they returned. The following morning, however, she heard about the homicide and appellant advised her he had been at the bar the previous night.

{¶21} During the winter months, police continued to investigate the homicide, but with little progress. Eventually, Mentor-on-the-Lake Police Chief John Gielink received information that one Robert Jenkins, next-door neighbor of Susan Gorsha, observed something of interest during the early-morning hours of Friday, November 26, 2010. Mr. Jenkins was awakened that morning around 5:00 or 5:30 a.m. by flickering lights casting through his second-floor bedroom window. The bedroom overlooks Ms. Gorsha's fenced-in yard. He arose and observed what appeared to be the back of a man standing near Ms. Gorsha's burning barrel, which was lit with a fire. Mr. Jenkins thought this was odd, given the time of morning and the cold and wet weather; he did not connect this event with the murder investigation, however, because the residents of Ms. Gorsha's home were, in his estimation, generally odd and quirky.

{¶22} With this new information, in April 2011, Detective David Strauss subsequently visited the Gorsha residence, observed the barrel, and seized it. He and members of BCI and FBI emptied the barrel's contents, identified various pieces of clothing and other random items. Among the items were Ms. McSween's sweater and

8

jeans, pieces of a bra, an eyelash curler, and a Crown Royal bag (identified by friends as the means by which Ms. McSween carried her tips).

{¶23} Appellant had since vacated the Gorsha residence and was living with his girlfriend, Linda Roncalli. A search warrant was executed on Ms. Roncalli's home in Madison, Ohio. Police seized appellant's computers, cell phone, and other personal property. Ms. Roncalli confirmed she had canceled plans to be with appellant on Thanksgiving and suggested they should not see each other anymore. She additionally confirmed appellant responded angrily. The morning after the murder, appellant contacted Ms. Roncalli and asked if she was watching the news, explaining a bartender was murdered at Mario's Lakeway Lounge. This time, appellant denied being there.

{¶24} **Forensics**

{¶25} The shoe-print impression taken at the crime scene was compared against appellant's boots. David Green, Trace Evidence Examiner Supervisor from LCCL, concluded the boot heel could not be eliminated as causing the impression. Also, in addition to the swabs taken from Ms. McSween's body, several swabs were collected from outside of her vehicle. Prior to the second trial, many of the samples were retested using updated Y-STR DNA testing, which ignores the X, female chromosomes and thus isolates the Y, male chromosome from DNA mixtures which include a female and male; this testing is particularly informative where the DNA mixture includes a predominating amount of female DNA with a male, whether minor or partial, profile. A male's Y-STR profile will be the same as his father's, brother's, paternal grandfather's, and anyone in his patrilineal line. The majority of the DNA taken from each location contained a predominance of Ms. McSween's DNA; using the Y-STR test,

9

all males identified at the bar on the evening in question, as well as other arguable suspects, were excluded as contributors to the male profile with the exception of appellant. Y-STR results do not involve probabilities, like typical STR results; instead, the DNA profile matching the Y chromosome is the same as that found in a given patrilineal line.

{¶26} The Y-STR DNA test found on the driver's-side, rear door of Ms. McSween's vehicle was the same Y chromosome DNA within appellant's patrilineal line. When extrapolating inheritance and common ancestors of everyone in the United States, there is approximately one in 1,909 statistical frequency of males with the same DNA profile.

{¶27} With respect to the swabs taken from Ms. McSween's body, the Y-STR test of the vaginal swab revealed a single, male profile consistent with appellant. Comparing all profiles taken in the course of the investigation (altogether, 49), all males were excluded as a contributor to the male DNA, with the exception of appellant. According to Dr. Karen Zavarella, a forensic scientist, one would expect this profile to occur, given the available comparative United States' data, a frequency of one in 699 male individuals. Moreover, a fingertip swab and right-hand swab of Ms. McSween yielded a partial profile consistent with appellant. All other males tested were excluded. The statistical frequency of this profile is one in 333. Finally, the rectal swab taken from Ms. McSween yielded a partial profile consistent with appellant and, similar to the previous test results, excluded all other males tested. The statistical frequency of this profile is one in 442.

{¶28} After considering the foregoing, the jury returned a verdict of guilty on all counts, with the exception of the aggravated murder count that included a death specification. Appellant was sentenced to life without the possibility of parole; 11 years for kidnapping; 11 years for rape; 11 years for aggravated robbery; and 36 months for tampering with evidence. All counts were ordered to be served consecutively for a total term of life imprisonment, plus 36 years.

{¶29} Appellant now appeals and assigns ten errors for our review. His first assignment of error provides:

{¶30} "The trial court erred when it failed to suppress evidence obtained through law enforcement's unlawful, warrantless seizure of Joseph Thomas' boots. Fourth and Fourteenth Amendments, U.S. Constitution; Article I, Section 16, Ohio Constitution."

{¶31} "An appellate court's review of the grant or denial of a motion to suppress presents a mixed question of law and fact." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8. "During a hearing on a motion to suppress evidence, the trial judge acts as the trier of fact and, as such, is in the best position to resolve factual questions and assess the credibility of witnesses." *State v. Lett*, 11th Dist. Trumbull No. 2008-T-0116, 2009-Ohio-2796, ¶13, citing *Burnside*, *supra*, at ¶8. "An appellate court reviewing a motion to suppress is bound to accept the trial court's findings of fact where they are supported by competent, credible evidence." *Id.* "Once the trial court's factual determinations are accepted, the appellate court then conducts a de novo review of the trial court's application of the law to those facts." *Wickliffe v. Dust*, 11th Dist. Lake No. 2005-L-129, 2006-Ohio-2017, ¶8, citing *State v. Dohner*, 11th Dist. Portage No. 2003-P-0059, 2004-Ohio-7242, ¶10.

11

{¶32} "'While the Fourth Amendment of the U.S. Constitution does not explicitly state that the violation of its provisions against unlawful search and seizure will result in suppression of the evidence obtained as a result of the violation, the U.S. Supreme Court held that the exclusion of evidence is an essential part of the Fourth Amendment.'" *State v. Eggleston*, 11th Dist. Trumbull No. 2014-T-0068, 2015-Ohio-958, ¶17, quoting *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶29, citing *Weeks v. United States*, 232 U.S. 383, 394 (1914) (overruled on other grounds) and *Mapp v. Ohio*, 367 U.S. 643, 649 (1961). "'The primary purpose of the exclusionary rule is to remove incentive from the police to violate the Fourth Amendment.'" *Id.*, quoting *Casey*, *supra*, at ¶29.

{¶33} Appellant does not take issue with the trial court's factual findings; instead he asserts the trial court violated his Fourth Amendment right to be free from a warrantless search and seizure when the police demanded him to remove his boots and subsequently took the same without a warrant. The trial court found that the plain view and exigency exceptions to the warrant requirement validated the officer's actions. Appellant challenges each legal conclusion.

{¶34} The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "Under the plain-view exception to the search warrant requirement, police may seize evidence in plain view during a lawful search if (1) the seizing officer is lawfully present at the

12

place from which the evidence can be plainly viewed; (2) the seizing officer has a right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *State v. Zerucha*, 11th Dist. Ashtabula No. 2015-A-0031, 2016-Ohio-1300, ¶17, citing *Horton v. California,* 496 U.S. 128, 136-137 (1990).

{¶35} "'Immediately apparent' means that the officer must have had probable cause to believe the item is contraband." *State v. Seibert,* 5th Dist. Tuscarawas No. 2004-AP-060048, 2005-Ohio-275, ¶17, citing *Arizona v. Hicks*, 480 U.S. 321, 326 (1987). "Probable cause merely requires that the facts available to the officer would warrant a person of reasonable caution in the belief that a certain item may be contraband. A practical probability that incriminating evidence is involved is all that is required." *Seibert, supra,* citing Tex*as v. Brown*, 460 U.S. 730, 742 (1983)." Such association may arise from the character of the property itself or * * * from the circumstances in which the property is discovered." *State v. Halczyszak*, 25 Ohio St.3d 301, 305 (1986). "[P]robable cause," implies a "'practical, nontechnical' probability that incriminating evidence is involved." *Brown*, *supra.* In making the probable cause determination, a police officer can rely upon his specialized knowledge, training, and experience. *Halczyszak*, *supra,* paragraph four of the syllabus. "Where police cannot fairly make a determination based on this standard, then the subject of inquiry requires the more technical determination which the magistrate alone is capable and empowered to make." *Id.*

{¶36} Appellant first asserts the plain-view exception to the warrant requirement does not apply to the seizure of his boots because the incriminating nature of the boots was not immediately apparent.

{¶37} In its judgment denying appellant's motion to suppress evidence, the trial court determined:

> {¶38} [T]he circumstances in which the property was discovered gave rise to a probability that incriminating evidence was involved. Prior to the April 21, 2011 interview, the police knew that shoe impressions from the crime scene existed, and that items belonging to the victim had been retrieved from the place the defendant resided at the time of the murder. At the April 21, 2011 interview, the police further learned that the defendant only owned the shoes he was wearing and that he owned and wore these shoes at the time of the murder. Thus, they had probable cause to believe that the defendant's shoes might be consistent with the shoe impression obtained from the crime scene, or that there may have been some other, albeit microscopic, transfer of evidence between the scene and the shoes.

{¶39} In light of the information available to law enforcement during the interview at which the boots were seized, particularly appellant's acknowledgement he was wearing the shoes on the night of the murder, we conclude officers had probable cause to seize them pursuant to the plain view exception. In light of this conclusion, we need not analyze the applicability of the exigency exception to the warrant requirement.

{¶40} Appellant's first assignment of error lacks merit.

{¶41} Appellant's second assignment of error provides:

{¶42} "The trial court erred when it allowed expert testimony from the state's witness who did not prepare or provide a report on new DNA evidence to the defense 21 days before the trial began. Evid.R. 104 and 702; Crim.R. 16(K). Fifth, Sixth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 1, 10 and 16 Ohio Constitution."

{¶43} "'A trial court's ruling on evidentiary issues, including the admissibility of expert opinions, will not be reversed on appeal absent an abuse of discretion and proof

14

of material prejudice.'" *State v. Allenbaugh*, 11th Dist. Ashtabula No. 2019-A-0017, 2020-Ohio-68, ¶30, quoting *State v. Belton,* 149 Ohio St.3d 165, 2016-Ohio-1581, ¶116. Crim.R. 16(K) requires that written expert reports must be disclosed to the opposing party no later than 21 days before trial. Crim.R. 16(K) states:

{¶44} **Expert Witnesses; Reports.** An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial.

{¶45} Crim.R. 16(K) seeks to "avoid unfair surprise by providing notice to the defense and allowing the defense an opportunity to challenge the expert's findings, analysis, or qualifications, possibly with the support of an adverse expert who could discredit the opinion after carefully reviewing the written report." *State v. Walls*, 6th Dist. Erie Nos. E-16-0127, E-16-028, 2018-Ohio-329, ¶27.

{¶46} In this matter, defense counsel indicated his intent to use certain images of alternate suspects during opening. The alternate suspects, however, had not been subjected to DNA testing. The state argued it was unaware of the defense's strategy and should be permitted to conduct DNA testing to support its theory of the case if the defense raised the alternate-suspect theory during opening. The defense countered, asserting the state could have tested the alternate suspects' DNA prior to trial and within the Crim.R. 16(K) window because the proposed suspects' names were brought up in a previous post-conviction relief petition.

15

{¶47} Although the state arguably could have anticipated the defense's advancement of an alternative-suspect theory and conducted DNA tests on them within the Crim.R. 16(K) window, the suspects at issue had not been specifically connected with the crime. The court stated it presumed the defense had a good-faith basis to advance an alternative-suspect theory; if it did so, however, the court determined it would permit the state to introduce DNA evidence to rebut the theory. The defense advanced its theory and DNA was collected from the individuals and tested. Dr. Karen Zavarella tested the samples, provided a report on July 18, 2019 and testified, inter alia, to her findings and conclusions on July 22, 2019. The suspects, according to Dr. Zavarella, were excluded as possible sources from the blood on Ms. McSween's vehicle.

{¶48} We conclude the trial court did not abuse its discretion by modifying the 21-day requirement because the state advanced good cause for the modification. The alternate suspects in this case were Richard Sanden, Gary Stroud, Miro Panic, and Mirko Brcinociv. The state obtained DNA from Mr. Stroud, Mr. Panic, and Mr. Brcinociv; as indicated above, they were excluded from the blood swabbed from the victim's vehicle. The fourth suspect, Mr. Sanden was apparently not tested and thus, there is no Crim.R. 16(K) issue pertaining to his status as a potential alternative suspect.

{¶49} With this in mind, there was no evidence submitted or elicited that indicated any of the remaining three alternate suspects were at or near the bar or crime scene on the night in question. Had the court denied the state an opportunity to test the individuals, the jury would have been permitted to speculate that one of the men descended upon the victim and brutally murdered her without a reasonable, supportive

16

foundation. Allowing the state to conduct the test curbed this potentially unfair and unsupported possibility.

{¶50} Further, the defense was not unjustly ambushed by the report. Dr. Zavarella's report was submitted to the defense several days before her testimony thereby allowing its expert, Dr. Julie Henning, some opportunity to review the report prior to Dr. Zavarella's testimony. Finally, the report did not necessarily undermine the defense's alternate-suspect theory: Although the tests at issue excluded the alternate suspects from the DNA on the vehicle, Dr. Zavarella did not specifically testify they were excluded from other sources of DNA mixtures, including those found on Ms. McSween's body as well as partial, unidentified male profiles found in her underwear. We accordingly discern no prejudice in the admission of the subject evidence. The trial court did not abuse its discretion in allowing the report outside of rule because the state established good cause and the defense did not suffer unfair prejudice.

{¶51} Appellant's second assignment of error lacks merit.

{¶52} For his third assignment of error, appellant asserts:

{¶53} "The trial court erred when it excluded evidence of polygraph and EyeDetect tests which denied Mr. Thomas his Constitutional right to present a complete defense. Fifth, Sixth and Fourteenth Amendments, U.S. Constitution; Art. I, Sections 1, 10 and 16, Ohio Constitution."

{¶54} Appellant's counsel filed a motion, pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), to use EyeDetect and polygraph evidence during trial to support appellant's assertion of innocence. After a hearing, the trial court

17

denied the motion. Appellant asserts this ruling denied him his right to present a full defense.

{¶55} Those charged with crimes are guaranteed "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). Rulings excluding favorable evidence are unconstitutional when they arbitrarily or disproportionately infringe upon an accused's weight interest to present a complete defense. *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

{¶56} *Daubert, supra*, was adopted by the Supreme Court of Ohio in *Miller v. Bike Alth. Co.*, 80 Ohio St.3d 607 (1998). *See Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶24. In *Daubert, supra*, the United States Supreme Court held that the language of the Federal Rules of Evidence governs the admissibility of expert, scientific evidence and places the trial court in the position of a "gatekeeper." "This gatekeeping function imposes an obligation upon a trial court to assess both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify." *Terry, supra.* As such, "the trial judge [has] the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert,* supra, at 597.

{¶57} With this in mind, "[p]olygraph test results are generally inadmissible to prove an accused's guilt or innocence" unless: "(1) the parties have stipulated their admissibility; (2) the court confirms the examiner's qualifications and test conditions; (3) the opposing party has had the opportunity to cross-examine the polygraph examiner; and (4) that the results do not tend to prove or disprove any element of the crime

charged and the court must instruct the jury about the weight of the polygraph evidence." *State v. Cleavenger*, 11th Dist. Portage No. 2019-P-0331, 2020-Ohio-1325, ¶21 citing *State v. Rowe*, 68 Ohio App.3d 595, 609-610 (10th Dist.1990), citing *State v. Souel*, 53 Ohio St.2d 123, 132 (1978).

{¶58} Initially, the polygraph results are clearly relevant to appellant's defense. With respect to reliability, however, the trial court concluded that "[p]olygraph tests are based on a theory that is not objectively verifiably or validly derived from widely accepted knowledge, facts, or principles and are therefore not admissible under Evid.R. 702."

{¶59} This court recently had occasion to address the admission of polygraph evidence in *Cleavenger, supra.* In discussing the pitfalls of polygraph evidence, this court observed "it is * * * easy to see why courts are loathe to admit [polygraph] results absent, inter alia, mutual stipulation because, regardless of the foundation and exploration of the science behind the polygraph, it is unclear that any technique or instrument is sufficiently 'acceptable' among scientists whose approval is a precondition to judicial recognition." *Id.* at ¶38.

{¶60} Because there was no stipulation to admitting the polygraph evidence and the trial court properly found such results are not necessarily reliable, we conclude it did not commit error when it found the results inadmissible.

{¶61} Appellant's third assignment of error lacks merit.

{¶62} Appellant's fourth assignment of error provides:

{¶63} "Joseph Thomas was denied the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984). Sixth

19

and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution."

{¶64} To prevail on a claim of ineffective assistance of counsel, an appellant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *State v. Ziefle*, 11th Dist. Ashtabula No. 2007-A-0019, 2007-Ohio-5621, ¶20. As such, appellant must show that counsel's performance was deficient and must additionally show prejudice resulting from the deficient performance. *State v. Jackson*, 11th Dist. Ashtabula No. 2002-A-0027, 2004-Ohio-2442, ¶9.

{¶65} Appellant first argues that trial counsel was ineffective for failing to make a specific argument that the alternate-suspect DNA had little probative value which was substantially outweighed by its unfairly prejudicial impact. He contends that although counsel objected pursuant to Crim.R. 16(K), he failed to object pursuant to Evid.R. 403. He maintains the probative value of the DNA evidence was substantially outweighed by the danger of unfair prejudice because it excluded suspects from the DNA on the vehicle; still, the state failed to test the evidence against the samples taken from Ms. McSween's body and thus it was fundamentally incomplete and misled the jury.

{¶66} Initially, as discussed under appellant's second assignment of error, that the state did not offer any evidence that would exclude the alternative suspects from the victim's body or clothing would arguably help the defense; that is, if they are not overtly excluded from the victim's body and clothing, the jury was free to consider the possibility they could not be excluded from those samples.

{¶67} Moreover, Evid. R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair

20

prejudice, of confusion of the issues, or of misleading the jury." Here, we discern no reasonable basis for counsel to object on relevancy grounds because the DNA test excluding the alternative suspects from Ms. McSween's vehicle was probative of a fact of consequence; namely, it tended to show that the alternative suspects were not contributors to the DNA mix on the vehicle, while appellant could not be excluded. Hence, even though the probative value of the DNA evidence relating to the alternative suspects may have been arguably minimal (due to its "incompleteness"), it was still relevant. We discern neither performance deficiency, nor prejudice.

{¶68} Next appellant argues counsel was ineffective for failing to make arguments in mitigation at sentencing. As appellant notes, counsel intentionally did not offer any mitigation evidence at sentencing; he stated on record: "Judge, we know the Court has limited options with respect to sentencing, because of the juror's verdicts. I've advised Joe not to make any statements with respect to allocutions. It is our intent to appeal this." Appellant underscores that, in his first trial, which was a capital murder case, counsel, during the mitigation phase, submitted exhibits, testimony from various family members and other individuals. Our appellate record, however, does not include a transcript of those proceedings and, as a result, we cannot assess the nature of the mitigation evidence counsel could have submitted.

{¶69} We recognize, pursuant to R.C. 2929.02(A), a person, like appellant, who is convicted of aggravated murder, "shall suffer death or be imprisoned for life." Under these circumstances, the trial court was obligated to sentence appellant for life. Still, we cannot glean from the record before us what counsel could have submitted in mitigation that may have given the trial court a basis for affording him an opportunity for parole at

21

some future date. Because the record does not include what mitigation evidence could have been offered, we are unable to evaluate appellant's argument.

{¶70} Appellant's fourth assignment of error lacks merit.

{¶71} Appellant's fifth assignment of error provides:

{¶72} "The trial court abused its discretion when it admitted excessive, duplicative, and highly prejudicial photographs at trial. Fourteenth Amendment, U.S. Constitution; Article 1 Section 16, Ohio Constitution, and Ohio Rules of Evidence 403."

{¶73} Appellant takes issue with the prosecution's introduction of some 37 autopsy photos. He argues the trial court erred in admitting them as they were excessive, duplicative, and prejudicial.

{¶74} As pointed out above, Evid. R. 403(A) prohibits admitting evidence that, even though relevant, its relevancy is substantially outweighed by the danger of unfair prejudice, confusing issues, or misleading the jury. When evaluating whether evidence should be excluded, "'[e]mphasis must be placed on the word "unfair."'" *State v. Clark*, 11th Dist. Trumbull No. 2013-T-0106, 2014-Ohio-5704, ¶70 quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). Moreover, Evid.R. 403(B) provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Appellant is required to demonstrate how the cumulative nature prejudiced his right to a fair trial. The Supreme Court of Ohio has observed:

{¶75} While it is true that the sheer number of photographs admitted may constitute error where they are needlessly cumulative, Evid.R. 403(B), the mere fact that there are numerous photos will not be considered reversible error unless the defendant is prejudiced thereby. Absent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result

22

in prejudice requiring reversal. *State v. DePew*, 38 Ohio St.3d 275, 281 (1988).

{¶76} Recently, the Supreme Court has revisited this issue, pointing out:

{¶77} [W]e caution trial courts to closely scrutinize the crime-scene and autopsy photos that are offered as exhibits in murder trials. The admission of gruesome photos exposes the jurors to horrific images, and when those photographs go to an element of the offense that is clearly proven by other evidence, they serve no useful purpose whatsoever. Instead, such exposure only serves to inflame the passions of jurors and risks subjecting them to harm. A few crime-scene photos showing the body along with the coroner's testimony will often suffice. *State v. Ford*, 158 Ohio St.3d 129, 2019-Ohio-4539, ¶257.

{¶78} First, appellant asserts the photographs of the victim's blood-covered face, body, and brain with scalp pulled contain minimal probative value because the wounds were either partially or entirely obscured. We agree that the photos of the crime scene and autopsy are disturbing, and the circumstances of the murder are horrific. Nevertheless, the photos of the victim's blood-covered body and face certainly demonstrate that many of the various wounds occurred prior to her death; similarly, the photo of her brain shows, per Dr. Galita's testimony and report, she suffered from a brain hemorrhage, which contributed to her death.

{¶79} Next, appellant argues two photos of the victim's left hand depicting defensive wounds were duplicative. Appellant is correct that the photos depict essentially the same injuries, one is simply a closer view. Still, these photos were taken after the victim's body had been washed and they are not particularly gory. And, the defensive nature of the wounds show the cuts occurred in the course of a struggle and thus likely were pre-mortem; in this regard, the photos, while substantially similar, provide a greater context to understand the circumstances immediately prior to Ms.

23

McSween's violent death; and, because they were taken at different ranges, we conclude they are not unnecessarily duplicative.

{¶80} Appellant further asserts two photos of the surgically opened neck wound, revealing the severed carotid artery are essentially the same. While the photos are similar, one photo depicts the wound closely and the other at some distance. The photos are not cumulative and provide the viewer with a different perspective of the size and character of this aspect of the fatal attack.

{¶81} Appellant next contends the two photos of the victim's genitalia are unnecessarily duplicative. These photos depict the injuries the victim sustained around the genital area; one of the photos provides visual context for Dr. Galita's testimony regarding his examination of that region during the autopsy. Hence, we do not view these images duplicative.

{¶82} Similarly, appellant challenges the admission of 10 photos of the victim's genitalia and anus. While we agree the photos are unpleasant, they were probative of Dr. Galita's testimony which established a foundation for the rape charge. The doctor testified that the damage to these areas resulted from a blunt, cylindrical object being forced into the victim's vagina and anus. These photos were therefore not cumulative, and their probative value was not substantially outweighed by the danger of unfair prejudice.

{¶83} Appellant's fifth assignment of error lacks merit.

{¶84} Appellant's sixth assignment of error provides:

{¶85} "The trial court erred when it sentenced Joseph Thomas to life without the possibility of parole despite the fact that the record clearly and convincingly did not

24

support such a punitive sentence, and R.C. 2953.08(D)(3) is unconstitutional if it prohibits appellate review of Mr. Thomas' sentence. Fifth, Eighth, and Fourteenth Amendments, U.S. Constitution; Article I, Sections 2, 9, and 16, Ohio Constitution. R.C. 2953.08."

{¶86} Appellant challenges his sentence under this assignment of error. First, he claims that R.C. 2953.08(D)(3), which prohibits appellate review of sentences for aggravated murder, is unconstitutional as it violates the constitutional prohibition against cruel and unusual punishment. He also asserts the statute is unconstitutional under the Equal Protection Clause because the effect of the statute treats those who receive sentences for aggravated murder differently than all other criminal offenders.

{¶87} A party asserting a statute is unconstitutional has the burden to prove the statute is unconstitutional beyond a reasonable doubt. *State v. Brownfield,* 12th Dist. Butler No. CA2012-03-065, 2013-Ohio-1947, ¶8. At the same time, "courts have a duty to liberally construe statutes in order to save them from constitutional infirmities." *Eppley v. Tri–Valley Local School Dist. Bd. of Edn.,* 122 Ohio St.3d 56, 2009-Ohio-1970, ¶12, citing *Desenco, Inc. v. Akron,* 84 Ohio St.3d 535, 538 (1999).

{¶88} R.C. 2953.08(D)(3) provides that "a sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2020.06 of the Revised Code is not subject to review under this section." Appellant acknowledges there is no constitutional right to direct appellate review of a criminal sentence. *See Ross v. Moffitt*, 417 U.S. 600, 610-611 (1974). He points out, however, that appellate review is a necessary procedural safeguard to prevent arbitrary and capricious imposition of the death sentence. *See Gregg v. Georgia*, 428 U.S. 143, 166-68 (1976). While appellant was

25

not sentenced to death, he contends a sentence of life without the possibility of parole shares some characteristics with death sentences that are not shared by other sentences. Notwithstanding these fair characterizations, appellant fails to specifically argue how denying appellate review of a sentence is cruel and unusual. If there is no constitutional right to appellate review of a criminal sentence, it makes little sense to assert the absence of such an entitlement is unconstitutional. Further, the denial of appellate review cannot be said to cause unnecessary and wanton infliction of physical pain, a requirement necessary to sustain a claim for an Eighth Amendment violation. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Appellant's Eighth Amendment argument lacks merit.

{¶89} With respect to appellant's equal protection argument, the Second Appellate District has determined that an aggravated murder defendant who receives a sentence of life without the possibility of parole is not a member of a suspect class. *State v. Burke,* 2d Dist. Montgomery No. 26812, 2016-Ohio-8185, ¶20. Moreover, as indicated previously, R.C. 2953.08(D)(3) does not implicate a fundamental constitutional right. Rather, the rights conferred by R.C. 2953.08 are statutory. As a result, the equal protection claim is properly analyzed under a rational basis standard.

{¶90} "The rational-basis test involves a two-step analysis. We must first identify a valid state interest. Second, we must determine whether the method or means by which the state has chosen to advance that interest is rational." *McCrone v. Bank One Corp.,* 107 Ohio St.3d 272, 2005-Ohio-6505, ¶9.

{¶91} "The General Assembly's practice of treating sentencing for aggravated murder and murder convictions differently from other felonies is longstanding. Before

the 1996 Senate Bill 2 felony sentencing amendments, the courts likewise held that the general felony sentencing requirements did not apply in aggravated murder cases." *State v.* Hollingsworth, 143 Ohio App.3d 562, 569 (8th Dist. 2001). Sentences for murder and aggravated murder fall under a special statutory scheme distinct from other felonies. *Burke, supra*, at ¶25. "Simply put, through the enactment of a separate statutory scheme regarding sentencing for aggravated murder, the legislature clearly intended said offenses to be treated differently because of their severity." *Id.* at ¶26.

{¶92} The General Assembly has a valid and reasonable interest in treating criminal offenses differently, based upon the perceived severity of the crime or felony. Moreover, it is neither arbitrary nor unreasonable to treat aggravated murder and murder differently than other classified felonies. Because these crimes necessarily involve the purposeful termination of another's life, they could reasonably be viewed as the most severe crimes, thus necessitating a different statutory procedure for purposes of sentencing and appeal. We therefore hold appellant has failed to demonstrate that R.C. 2953.08(D)(3) is not rationally related to a legitimate state interest.

{¶93} Although appellant takes issue with the trial court's imposition of life imprisonment without the possibility of parole, our conclusion(s) that R.C. 2953.08(D)(3) is not unconstitutional precludes consideration of appellant's argument. Pursuant to R.C. 2953.08(D)(3), we are without statutory authority to review appellant's sentence of life imprisonment without parole for aggravated murder.

{¶94} Appellant's sixth assignment of error lacks merit.

{¶95} Appellant's seventh assignment of error states:

{¶96} "The trial court denied Joseph Thomas his right to allocution. Crim.R. 32(A). R.C. 2929.19(A). Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution."

{¶97} Pursuant to Crim.R. 32(A)(1), before imposing sentence, "the trial court shall 'address the defendant personally' and ask whether he or she wishes to make a statement on her own behalf or present any information in mitigation of punishment." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶166. "Although not considered a constitutional right, the right of allocution is firmly rooted in the common-law tradition." *State v. Brown*, 166 Ohio App.3d 252, 2006-Ohio-1796, ¶6 (11th Dist.).

{¶98} "The doctrine of invited error holds that a litigant may not 'take advantage of an error which he himself invited or induced.'" *State v. Campbell*, 90 Ohio St.3d 320, 324 (2000), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co.*, 28 Ohio St.3d 20 (1986). The record must demonstrate that defense counsel induced or was actively responsible for the trial court's error for the trial court's error. *Campbell*, *supra*, *citing State v Kollar*, 93 Ohio St.89, 91 (1915). This means defense counsel must suggest, request, or actively consent to the improper procedure. *Campbell*, *supra*.

{¶99} Here, the trial court did not specifically address appellant personally and ask if he wished to exercise his allocution right. Defense counsel, however, expressly told the trial court that he advised appellant not to exercise his right to allocution. There are many reasons why counsel may have so advised appellant, not the least of which would be preventing appellant to say something inculpatory that might be used against him and potentially jeopardize his appeal. Regardless, any error in the court failing to personally address appellant was due to defense counsel's affirmative and explicit

28

representation that he advised appellant not to speak in allocution. Any error was therefore invited.

{¶100} Appellant's seventh assignment of error lacks merit.

{¶101} Appellant's eighth assignment of error asserts:

{¶102} "Mr. Thomas' convictions are not supported by the manifest weight of the evidence. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution."

{¶103} A court reviewing the manifest weight observes the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Schlee,* 11th Dist. Lake No. 93-L-082, 1994 WL 738452, *5 (Dec. 23, 1994).

{¶104} Appellant first asserts the state failed to prove motive, opportunity, intent, and means. The state was not required to establish motive, opportunity, or means. Still, the state did advance circumstantial evidence that appellant was agitated about a breakup; he was present and, indeed, was the last individual at the bar. Finally, testimony indicated he was carrying a knife in his pocket. And, to the extent the jury believed the state's theory of the case, the murder was committed with obvious purpose, thereby establishing intent.

{¶105} The state introduced evidence that appellant was at Mario's Lakeway Lounge on the night of the murder; witnesses testified that he was irritated because he and his girlfriend had broken up earlier in the evening. Appellant was also seen with a

knife on his person. Mr. Cacic testified appellant was the last patron in the bar that night and was leering at Ms. McSween as she restocked the bar's cooler.

{¶106} All men at the bar that night were swabbed for DNA and tested. In preparation for the second trial, Hallie Dreyer performed Y-STR DNA tests, which isolates the male Y chromosome from a sample – this test was not performed in appellant's first trial. All males, other than appellant, were excluded as contributors to the DNA mixture found on Ms. McSween's vehicle as well as the mixture taken from Ms. McSween's body. Appellant takes issue with Ms. Dreyer's testimony that Y-STR testing cannot point specifically to an individual contributor; although this point is worthy of consideration, it overlooks the important point that the results are capable of identifying the Y chromosome within a particular patrilineal profile. Again, appellant's patrilineal profile could not be excluded, but all other males tested were.

{¶107} Furthermore, Robert Jenkins, the neighbor of Susan Gorsha, the residence where appellant was staying at the time of the murder, reported witnessing what he described as a man burning something in a barrel early on the morning of November 26, 2010. When police seized the barrel and searched its contents, they found Ms. McSween's burned clothing and some personal effects. And, although appellant admitted to his house-mate Jackie Miller he was at the bar the morning after the murder, he denied being present to his girlfriend, Linda Roncalli.

{¶108} While we acknowledge this is a challenging case, we nevertheless conclude there was sufficient, credible circumstantial evidence for the jury to conclude, beyond a reasonable doubt, appellant committed the aggravated murder of Annie McSween.

{¶109} Moreover, Dr. Galita's testimony that Ms. McSween had a cylindrical object inserted into her vagina and anus was sufficiently persuasive to allow the jury to draw the conclusion that she was raped. Similarly, his testimony that she was beaten and dragged, likely naked, through the parking lot was sufficiently persuasive to support the kidnapping count. Moreover, the circumstantial evidence that appellant took or attempted to take Ms. McSween's belongings while using a knife to assault and eventually murder her was enough for the jury to find him guilty of the aggravated robbery counts. And, finally, the evidence that appellant was burning Ms. McSween's clothing and belongings in the burn barrel was sufficiently persuasive to find him guilty of tampering with evidence.

{¶110} Appellant's eighth assignment of error lacks merit.

{¶111} Appellant's ninth assignment of error provides:

{¶112} "The trial court's statements to the jury and media communications constitute judicial bias in violation of Joseph Thomas' right to due process. Fifth and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution."

{¶113} Due process requires that a criminal defendant be tried before an impartial judge. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶34. Judicial bias involves "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." *Id.*

{¶114} Under his ninth assignment of error, appellant contends he was denied due process because the trial court made statements reflecting judicial bias. Specifically, appellant points out the trial court made various comments to counsel regarding costs associated with the trial, particularly costs that would be incurred if the judge were to declare a mistrial due to the parties or jurors ignoring his orders. Appellant asserts the comments show hostility towards his case and irritation that it had to be re-tried.

{¶115} Initially, appellant did not object to the comments, request recusal, or seek disqualification. Because appellant did not take issue with the court's statements, he has forfeited the issue on appeal. *See State v. Dean*, 146 Ohio St.3d 181, 2015-Ohio-4347, ¶223. Even had the issue been properly preserved, however, it lacks merit. The judge's comments, while direct, demonstrate he was circumspect regarding the integrity of the proceeding. We do not perceive any of the court's comments as hostile to appellant or evincing an unfair bias toward his defense. We consequently fail to see how the judge's remarks represent a violation of appellant's due process rights.

{¶116} Next, appellant asserts his due process rights were violated because the trial court purportedly encouraged media outlets to provide coverage because the case was "extremely interesting." Appellant points to an email between the trial judge and Court TV and asserts the communication underscores the trial court's "continued solicitation of national coverage." We fail to see how the trial court's interaction with the media in any way compromised the fairness of the proceedings or the trial judge's objectivity. The email does not reflect hostility of favoritism to either side; and, actually,

it could be viewed as a vehicle for making the proceedings accessible to a greater population of people thereby enhancing public transparency of the trial.

{¶117} Appellant's ninth assignment of error lacks merit.

{¶118} Appellant's final assignment of error provides:

{¶119} "The cumulative effect of the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Assignments of Error denied Joseph Thomas a fair trial. Fifth, Sixth, and Fourteenth Amendments, U.S. Constitution; Article I, Sections 10 and 16, Ohio Constitution."

{¶120} Under his final assignment of error, appellant asserts his convictions should be reversed based upon the cumulative errors throughout the proceedings. Because, however, we find no error, there can be no cumulative error.

{¶121} Appellant's tenth assignment of error lacks merit.

{¶122} For the reasons discussed in this opinion, the judgments of the Lake County Court of Common Pleas are affirmed.


THOMAS R. WRIGHT, J.,

MATT LYNCH, J.,

concur.