[Cite as *State v. Gasper*, **2023-Ohio-1500**.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220218 |
| | | TRIAL NO. B-1905677 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| MARK GASPER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 5, 2023

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Alex Scott Havlin*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *David Hoffman*, Assistant Public Defender, for Defendant-Appellant.

**Bock, Judge.**

**{¶1}** A jury found defendant-appellant Mark Gasper guilty of raping K.W. We affirm Gasper's conviction.

## I.  Facts and Procedure

**{¶2}** K.W., a 36-year-old woman, has cerebral palsy and intellectual disabilities. Her parents adopted multiple children with developmental disabilities. They hired Gasper to care for K.W.'s severely developmentally-challenged siblings.

**{¶3}** Gasper inadvertently sent a text message to K.W.'s father, which revealed that Gasper and K.W. were engaging in sexual conduct.

**{¶4}** In November 2019, the state indicted Gasper on seven counts of rape under R.C. 2907.02(A)(1)(c), which prohibits sexual contact with a person who cannot consent because of a substantial impairment. Specifically, the state accused Gasper of engaging in sexual contact with K.W., "and K.W.'s ability to resist or consent was substantially impaired because of a mental or physical condition * * * and [Gasper] knew or had reasonable cause to believe that K.W.'s ability to resist or consent was substantially impaired."

*Both parties raised Daubert challenges*

**{¶5}** The court appointed Dr. Thaddeus Nestheide, the Hamilton County Department of Disability Services ("DDS") supervising psychologist, to assess K.W.'s ability to consent to sexual activity. Gasper enlisted his own expert, Dr. Carla Dreyer.

**{¶6}** Both the state and Gasper asked the court to exclude the other party's expert. Gasper challenged Nestheide's use of the General Sexual Knowledge Questionnaire ("GSKQ") as a tool to determine whether K.W. possessed appropriate sexual knowledge to consent to sexual activity. The state asserted that Dreyer's

testimony was inadmissible under Evid.R. 702(C) because she "did not perform a scientifically reliable evaluation of the victim."

{¶7} Dreyer assessed K.W. by reviewing court filings, Gasper's statements, investigation reports, an interview with K.W. at the Mayerson Center for Safe and Healthy Children at the Cincinnati Children's Hospital Medical Center, and Nestheide's report. She testified that she did not do any psychological testing, but "clinical interview and reviewed information [sic] [as this method is] consistent with the practice." Because Nestheide had conducted an intelligence test on K.W., Dreyer felt that there was "no indication that there would have been a change in [K.W.'s] intellectual or cognitive functioning since that assessment * * * [a]nd the Vineland was similar in that regard." Regarding Nestheide's reports, Dreyer only disapproved of Nestheide's use of the GSKQ as she believed that it was not widely accepted by psychology professionals. Though Dreyer agreed that K.W.'s "intellectual functioning, although not formally measured during [Dreyer's] assessment, is estimated to be in the Borderline range," she concluded that K.W. was able to consent to sexual activity because K.W. did not have a substantial impairment due to a mental condition.

{¶8} Dr. Nestheide conducted an updated I.Q. assessment and adaptive behavior tests to determine K.W.'s overall level of functioning and used several tests to determine whether K.W. could consent to sexual activity. The Mini-Mental Status Exam ("MMSE-2") is a "quick kind of screener to see how someone is functioning, if they're oriented to the situation." The Wechsler is "the most commonly used standardized intelligence test" and provides "a full-scale IQ score * * * across a bunch of domains," which are "verbal comprehension, working memory, and processing speed." The Vineland is "an adaptive behavior assessment that looks at daily living

skills and intellectual assessment," which "is part of the DSM definition and criteria for intellectual disability." Adaptive behavior is "defined as the performance of daily activities required for personal and social sufficiency."

{¶9} Nestheide testified that the GSKQ is not used just for sex offenders, as stated by Dreyer. A 2017 paper entitled "Quantitative Assessment of Sexual Knowledge and Consent Capacity in People with Middle to Moderate Intellectual Disability" identified the GSKQ as a commonly-used tool to assess sexual knowledge.

{¶10} Nestheide testified that K.W. does not have the ability to consent to sexual activity, adding that K.W. "presents as quite normal," "will struggle socially" as she had not had a lot of relationships or experience with relationships, people "can overlook the challenges that she might have," and people like K.W. are "definitely" a "more vulnerable" group. Nestheide concluded that K.W. has borderline intellectual functioning, which impairs "her ability to deal with unfamiliar circumstances or stressful situations, such as those allegedly performed by [Gasper]." He further testified that K.W. is a "concrete thinker" and takes what people say literally. "If someone says I'm going to do this thing, I think that she would hear that as something will actually happen."

{¶11} The trial court permitted both Dreyer and Nestheide to testify about their respective tests and opinions involving K.W.'s ability to consent to sexual activity.

*K.W. testified about Gasper's actions*

{¶12} One evening in the fall of 2017, K.W. had taken Baclofen, her nightly medication to relieve muscle spasms, which made her sleepy. K.W. said that she had fallen asleep on the couch in the basement near her bedroom when:

* * * the next thing I knew, I thought [Gasper] was getting me up to * * * walk me to my room * * * as I thought he was walking me to my bed, we started walking over by the table. And I couldn't figure out * * * I was trying to figure out why.

{¶13} According to K.W., she turned her head away when Gasper tried to kiss her. He kept asking her to spread her legs and he put his hands down her pants but she "kept trying to hold them closed" and she could not "remember how many times." She stated, "Finally I just gave in because I knew he wasn't going to quit." K.W. testified that she kept saying, "Honor thy Father and Mother" as Gasper was pulling her pants down. Gasper performed oral sex on K.W. She testified that she "didn't ask for that first night when I thought he was taking me to my bedroom so I wouldn't fall because I had taken my medicine. I didn't know he was going to do that to me."

{¶14} Gasper and K.W. engaged in additional sexual encounters. Some were at her house and others were at his house. These encounters continued for more than a year.

{¶15} K.W. asserted that she did things which she was uncomfortable doing because of her fear. But she did not show her discomfort in order "to please him." She testified that she was concerned about pleasing him because, "I guess I was scared." K.W. did not tell her friends about the sexual encounters because she felt "ashamed for some reason." K.W. repeatedly said she was fearful, asserting that Gasper caused her to fear that he would do something to her siblings or mother.

{¶16} K.W. testified that Gasper wanted to take her to Tennessee to live, but she told him that she would miss her family and her dog, Candy. When Candy died, K.W. believed Gasper had killed Candy to get her out of the way so that K.W. would

move to Tennessee with him. K.W. stated that Candy died trying to protect K.W. from Gasper. Eventually, Gasper's counsel objected to this line of testimony. The court overruled the objection, finding that the testimony was "part and parcel of the charges" due to K.W.'s testimony about Tennessee.

{¶17} Because K.W. was developmentally delayed as a child, DDS referred her to the Mayerson Center for an interview with a clinical social worker after her father learned of the sexual encounters.

*State introduced evidence of K.W.'s intellectual disabilities*

{¶18} A 2003 letter from K.W.'s pediatric neurologist stated that K.W.'s I.Q. was 66 and she "associates better with 12-year-old peers than same-aged peers."

{¶19} D.W. (K.W.'s father) testified that K.W. is "mentally about 14 years old." D.W. discussed the physical and developmental issues that K.W. had experienced growing up. He said that K.W. was in special classes in school, had participated in programs designed to help developmentally-disabled individuals get jobs and strive for independence, and had been collecting supplemental social security income ("SSI") since she was 21 (after the adoption subsidy ran out). D.W. testified that K.W. was unable to obtain a driver's license or employment despite the training due to her developmental delays.

{¶20} K.W. testified about her developmental delays, stating that she should never have been disconnected from DDS services. K.W. stated, "The thing with cerebral palsy and intellectual disabilities and mental challenges, I don't understand everything and I don't remember everything. I have short-term memory loss. I was in special classes at school." K.W. discussed Project Search and the Developmental Disabilities Behavioral Pediatrics Clinic, where she trained in hopes of becoming

employed. K.W. had never been able to secure a job. K.W. was very involved with the Special Olympics.

{¶21} K.W. struggled to explain concepts. When explaining the first night that she and Gasper engaged in intercourse, she stated, "Well this was the first night of actual—I guess everybody has been calling it intercourse." When asked what she meant by "he did oral," she responded, "[i]t was like oral sex, I guess, is how you explain it." She struggled to remember the places Gaspar touched her body. K.W. expressed discomfort with talking about the incidents. She said she could not explain to the jury what happened "like [she] was able to before" because she could remember more when it first happened when "[i]t was freshly in [her] mind." Instead of making her name body parts in open court, the court permitted K.W. to circle parts on anatomical pictures. K.W. struggled to discuss the final sexual encounter with Gaspar, repeatedly saying, "I can do this."

{¶22} K.W. appeared to be frustrated during cross-examination when responding to counsel's repeatedly asking why she did not refuse Gasper. K.W. once responded, "I wish it was that easy. I don't know if I could have. I don't know if I could have. I was stuck. I couldn't get out of anything. The only thing I had freedom for was Special Olympics." She also responded, "What was I supposed to do? I had said no many times. Just because I don't say it, I shake my head no. It didn't matter. Why don't you understand that?" K.W. expressed that she did not know what to do and she wanted to tell somebody.

{¶23} Nestheide testified to administering the MMSE-2, explaining that it tests whether there is "any kind of impairment in somebody's cognitive functioning." K.W. scored 27 out of a possible 30 points, and "those tests are essentially designed so

that most everyone would get every point available." Nestheide asserted that K.W.'s score was lower than would be expected, being that she had graduated from high school.

{¶24} Nestheide explained that, considering K.W.'s results on the MMSE-2, the Vineland, and the Wechsler, K.W. was in the borderline range of intellectual functioning, which used to be called "mental retardation." He explained that people who function in this range tend to be gullible, naïve, struggle with problem solving in social situations, can have difficulty understanding the intentions of others, and more. While people with borderline intellectual functioning can handle most of their day-to-day activities by themselves, they struggle "a little bit more" when they are in unusual situations.

{¶25} Nestheide testified that he considered her rationality, knowledge, and voluntariness when determining K.W.'s ability to consent to sex. He tested K.W.'s rationality via the MMSE-2, the Vineland, and the Wechsler tests. K.W.'s score was lower than 95 percent of the population, rendering her rationality impaired due to her overall cognitive functioning. Nestheide testified that this affects K.W.'s ability to agree to engage in sexual activity.

{¶26} Nestheide testified that the GSKQ is used to test the sexual knowledge of people with or without disabilities. It covers whether the person understands anatomy and physiology, acts of sexual activity, risks of pregnancy and illness, and more. He added that there are a variety of tools to make these findings and there is no tool that is generally accepted over another. K.W. scored 57 points out of a possible 110. Her "knowledge of sexual activity was more consistent to the knowledge that people with a more significant intellectual disability might have." Nestheide testified

that the GSKQ revealed that K.W.'s sexual knowledge is impaired because her scores were closer to what would be expected of someone with a more significant disability.

{¶27} Voluntariness is the "ability to express and act on the choice to engage or not engage in sexual activity." K.W. informed Nestheide that she told Gasper, "No," because she did not want to engage in sexual activity, but she "ultimately complied because there were threats made against her siblings." Nestheide concluded that K.W.'s results did not meet the voluntariness standard because she complied due to feeling threatened, and K.W.'s belief that Gasper had killed Candy also impaired voluntariness.

{¶28} When asked on cross-examination whether rationality, voluntariness, and knowledge were like "a three-legged stool" that falls over when one leg is taken away, Nestheide responded, "I haven't seen it written in the literature that if one were removed, that would change the ultimate outcome." He later stated that he believed that all three legs are needed.

### Gasper's expert testified that K.W. could consent to sex

{¶29} Gasper's expert witness, Dr. Dreyer, stated that "there is no universal standard for this type of assessment * * * no specific protocol that is recommended * * * you have to use good clinical judgment to do it and based on the literature and the * * * case law that you have available." Dreyer testified that the components that "the literature" supports in looking at capacity to consent to sexual activity typically include a person's knowledge, rationality or reasoning, and understanding of the voluntary nature of sexual activity.

{¶30} Dreyer did not repeat Nestheide's tests because "[t]ypically intelligence scores will stay steady over time" and K.W.'s I.Q. score "was consistent with her

presentation." She testified that people with intellectual disabilities have an I.Q. below 70, but that there is no set I.Q. that is attached to an individual's ability to consent to sexual activity and that no assumptions can be made either way. Dreyer stated that K.W. has a borderline functioning intellect, her abilities are "unevenly developed," and she "is below average intellect."

{¶31} Dreyer denied that the GSKQ is widely accepted in the psychological field and had not seen it used clinically. Dreyer concluded that K.W. was knowledgeable about sex based on her conversation with her doctor about sexually-transmitted infections ("STI"), K.W. was trying to learn more about STIs as it pertains to oral sex, and she was aware of and "understood that people can't be forced to engage in sexual activity." Dreyer also concluded that K.W. was rational in engaging in sexual activity because she knew to talk to someone about it.

{¶32} As to voluntariness, Dreyer testified that K.W. "under[stood] her ability to understand that she can say no, that she can decline to consent or she can choose to consent" because she initially told Gasper, "No." On cross-examination, Dreyer acknowledged that K.W. felt pressured to engage in sex with Gaspar after saying no, and that K.W. indicated that she was forced to have sex.

{¶33} Dreyer attributed K.W.'s circumstances to growing up in a conservative family, being very dependent on them, and that her family "infantilized her," suggesting that K.W.'s family put it in her head that she was raped. She also concluded that D.W.'s guardianship over K.W. was due to cerebral palsy versus a "mental problem."

*Gasper denied any wrongdoing*

**{¶34}** Gasper, who is nearly 32 years older than K.W., had been working for the family for three years before he and K.W. began having sex. He characterized K.W. as an "able person, intelligent, energetic." Gasper stated that K.W. taught him a lot, from how to use a smart phone to how to take care of her disabled siblings. He characterized K.W.'s assistance to her siblings as her "working" and stated that he and K.W. were "working together" on the night of the first sexual encounter.

**{¶35}** Gasper knew that K.W. was a virgin and that she had only kissed a boy before but did not like "French kissing." He characterized the interactions as "something [they] both wanted, " that K.W. was "completely in charge of when she was ready," and that the first encounter was "just some touching, manual [sic] [stimulation] for her." Gasper asserted that K.W. went to her doctor because she wanted to become sexually active.

**{¶36}** Gasper did not want to be in public with K.W. because he was afraid that she would be removed from the Special Olympics or have problems with her parents. Gasper stated to police that he was concerned about the situation with K.W. "getting out" and him "having problems working somewhere" if anyone learned that he had sex with a then 32-year-old woman that had cerebral palsy.

**{¶37}** Gasper denied ever threatening K.W., killing Candy, or knowledge that K.W.'s ability to consent to sex was impaired due to a substantial mental disability. But he conceded that K.W.'s only friends were from the Special Olympics, she was 32 years old at the time of the incidents but still lived with her parents, collected SSI, and did not work or drive.

{¶38} Gasper denied that K.W. was asleep before their first encounter and denied that he pressured her to have sex, that he wanted to conceal their encounters, and that she did not want to have a sexual relationship with him.

*The jury found Gasper guilty of count one*

{¶39} The jury found Gasper guilty of count one and acquitted him of the remaining six counts. The first count involved their first sexual encounter in which K.W. testified that she had taken medication before Gasper pressured her into having sex.

{¶40} The trial court sentenced Gasper to 11 years in prison and advised Gasper of his duty to register as a Tier III sex offender. Gasper moved for a new trial—the trial court denied his motion. This appeal followed.

## II.     Law and Analysis

{¶41} On appeal, Gasper asserts that the trial court erred by 1.) failing to suppress Nestheide's testimony involving the GSKQ, 2.) convicting Gasper based on insufficient evidence of a substantial impairment, 3.) convicting Gasper against the manifest weight of the evidence, 4.) admitting other-acts evidence, and 5.) denying Gasper's motion for a new trial. We consider his assignments of error out of order.

A.  The trial court did not err in overruling Gasper's motion for a new trial

{¶42} In his fifth assignment of error, Gasper argues that he is entitled to a new trial because the trial court permitted the state to change its theory of prosecution by adding the issue of the drug Baclofen at the close of all evidence. The state, before trial, represented that it would not rely on K.W.'s physical condition; instead, it would only seek to prove that K.W. had a substantial mental impairment that prevented her from consenting to sexual activity.

12

{**¶43**} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Garrett*, Slip Opinion No. 2022-Ohio-4218, ¶ 141, quoting *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 42, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A trial court's decision to deny a new trial is reviewed for an abuse of discretion. *State v. Brown*, 1st Dist. Hamilton No. C-210355, 2022-Ohio-2752, ¶ 56.

{**¶44**} The trial court did not abuse its discretion. Gasper argues that because 1.) the jury asked the court whether it could consider K.W.'s ingestion of Baclofen to determine K.W.'s capacity to resist or consent, 2.) the court instructed the jury to use the instructions that it had been given, and 3.) the jury returned 30 minutes later with a guilty verdict on the charge in which K.W. had testified that she was sleepy due to Baclofen, but acquitted him on the remainder of the counts, Gasper was deprived of a fair trial because the nature of the charge had changed.

{**¶45**} We disagree. The state did not change its theory of the case or the nature of the charges. It was the jury that asked about K.W.'s medication. The trial court's response—that the jury was to use the instructions that the court had already provided—was not a "green light" for the jury to consider improper evidence. Instead, we presume that the jury followed the original jury instructions.

{**¶46**} There were no interrogatories to test the basis of the jury's verdicts. This court will not presume to know why the jury convicted Gasper of the first count yet acquitted him on the remaining counts. And we will not speculate. Verdicts that are inconsistent do not entitle a defendant to a new trial when the court does not know the basis for the jury's verdicts. *State v. Hampton*, 1st Dist. Hamilton No. C-010159, 2002

Ohio App. LEXIS 1543, 24 (Apr. 5, 2002).

**{¶47}** The trial court did not abuse its discretion by denying Gasper's motion for a new trial. We overrule Gasper's fifth assignment of error.

> B. Gasper's motion to suppress the GSKQ was properly overruled

**{¶48}** Gasper argues in his first assignment of error that the GSKQ is not an objectively verifiable measure of sexual knowledge for purposes of assessing a person's capacity to consent and that it is not generally accepted testimony in the psychological field.

**{¶49}** Trial courts have broad discretion in determining the admissibility of expert testimony. *State v. Chapman*, 1st Dist. Hamilton Nos. C-160397, C-160398 and C-160399, 2017-Ohio-8181, ¶ 14; *see State v. Edwards*, 1st Dist. Hamilton No. C-100200, 2011-Ohio-1752, ¶ 15. In general, courts should admit expert testimony when it is material and relevant under Evid.R. 702. *Id.* A trial court's "gatekeeping function imposes an obligation upon a trial court to assess both the reliability of an expert's methodology and the relevance of any testimony offered before permitting the expert to testify." *State v. Thomas*, 11th Dist. Lake No. 2019-L-085, 2020-Ohio-4635, ¶ 56. A trial court must ensure that an expert's testimony is based on a reliable foundation and is relevant. *Id.*

**{¶50}** Evid.R. 702 permits a witness to testify as an expert when 1.) the testimony relates to matters beyond the knowledge or experience of a lay person, 2.) the witness has specialized knowledge, skill, experience, training, or education regarding the subject matter of his or her testimony, and 3.) the testimony is based on reliable, scientific, technical, or specialized information. *Id.* at ¶ 15.

{**¶51**} The trial court's role is not to evaluate which competing scientific analysis or conclusion is correct. *D'Amore v. Cardwell*, 6th Dist. Lucas No. L-06-1342, 2008-Ohio-1559, ¶ 66. Where the evidence is admitted, it is for the jury to decide the weight to give such testimony. *Id.* It remains the prerogative of the jury to reject expert evidence "for any number of reasons," including unreliability. *Id.*

{**¶52**} Gasper asserts in his brief, "There are no state or federal cases at any level nationwide which address the GSKQ in any context." He is incorrect. The Superior Court of Pennsylvania found the GSKQ to be a scientifically-verifiable test. *Commonwealth v. Gephart*, 224 A.3d 748 (Pa.Super.2019). The defendant challenged the state's expert's "testimony, methodology, and findings when he offered his opinion that the victim was incapable of consent. * * * [The state's expert] relied upon the GSKQ to form the basis of his opinion. * * * Gephart provides no authority that would allow this Court to conclude that [the state's expert]'s methodology was scientifically erroneous." *Id.* The court held that "while there is obviously some level of subjectivity associated with the type of examination performed by [the state's expert], we find that there was sufficient evidence to enable the fact-finder to determine that the victim was unable to consent to sexual activity." *Id.*

{**¶53**} Gasper does not argue that the testimony based on the GSKQ is irrelevant. Instead, Gasper argues that the GSKQ is not a reliable test to measure capacity to consent, and therefore, Nestheide's report and testimony involving the GSKQ was inadmissible.

{**¶54**} The GSKQ is a test to determine sexual knowledge, a component to consent. It does not determine whether a person can consent to sexual activity. Dreyer testified that there is no universal standard to measure consent and no specific

15

protocol is recommended. Nestheide testified that there is no single generally-accepted test that is better than another. Nestheide also offered that a 2017 scientific paper identified the GSKQ as a commonly-used tool to assess sexual knowledge.

**{¶55}** To evaluate scientific reliability, courts should apply the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

> The trial court should first assess whether the method or theory relied upon has been tested. Next, it should consider whether the theory has been the subject of peer review, and then whether the method has a known or potential error rate. Finally, *Daubert* instructs trial courts to look at whether the theory has gained general acceptance in the scientific community. None of these factors, of course, is dispositive of the inquiry, and when gauging the reliability of a given expert's testimony, trial courts should focus "solely on principles and methodology, not on the conclusions" generated.

(Internal citations omitted.) *City of Brook Park v. Rodojev*, 161 Ohio St.3d 58, 2020-Ohio-3253, 161 N.E.3d 511, ¶ 24, quoting *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, 875 N.E.2d 72, ¶ 25, quoting *Daubert*.

**{¶56}** The trial court overruled Gasper's *Daubert* motion because the tools that Nestheide used to test to measure K.W.'s knowledge, and the reliability of those tools, could be cross-examined at trial.

**{¶57}** Gasper asserts that Nestheide's testimony involving voluntariness was fatally flawed because it was based on K.W. saying no and Gasper forcing her to have

sex, which has no bearing on one's capacity to consent. But Nestheide also testified that K.W. would not have understood that she could have rejected Gasper.

**{¶58}** Nestheide used multiple tests to conclude that K.W. was unable to consent. Moreover, Nestheide interviewed K.W. and evaluated her personally to conclude that she was unable to consent. Additionally, Gasper was able cross-examine Nestheide about the GSKQ.

**{¶59}** The trial court did not abuse its discretion by permitting Nestheide's expert testimony. We overrule the first assignment of error.

### C. Gasper's conviction was supported by sufficient evidence.

**{¶60}** Gasper's second assignment of error asserts that the evidence was insufficient because the state failed to prove both that K.W.'s ability to consent was substantially impaired by her medication or low I.Q. and that Gasper had knowledge of any impairment.

**{¶61}** The test for determining the sufficiency of the evidence is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717. It is a question of law for the court to determine, and this court is not to weigh the evidence unless, after viewing the evidence, it weighs heavily against conviction. *Id.* at ¶ 12.

**{¶62}** Gasper was convicted of rape under R.C. 2907.02(A)(1)(c). It provides:

No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person's ability to

17

resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age.

{¶63} The term "substantially impaired" is commonly understood to be consistent with "a present reduction, diminution, or decrease in the victim's ability" to control, or appraise the nature of, the defendant's conduct. *State v. Jordan*, 1st Dist. Hamilton Nos. C-210198 and C-210199, 2022-Ohio-1512, ¶ 14, quoting *State v. Zeh*, 31 Ohio St.3d 99, 103-104, 509 N.E.2d 414 (1987) (interpreting "substantial impairment" under R.C. 2907.03(A)(2)). Ohio courts have routinely applied this definition in cases of gross sexual imposition and rape of a victim impaired due to a cognitive disability or voluntary intoxication. *State v. Yerkey*, 7th Dist. Mahoning No. 20MA0087, 2021-Ohio-3331, ¶ 29.

{¶64} Although substantial impairment may be established through expert testimony, it is not required. *State v. Slaughter*, 2d Dist. Montgomery No. 25270, 2013-Ohio-1824, ¶ 7. Substantial impairment also may be established through lay testimony. *Id*. Viewed in a light most favorable to the prosecution, testimony that a victim had a learning disability satisfied the "mental condition" component of R.C. 2907.02(A)(1)(c). *State v. Wolff*, 7th Dist. Mahoning No. 07 MA 166, 2009-Ohio-2897, ¶ 68.

Sufficient evidence supported K.W.'s lack of capacity to consent

{¶65} The testimony established that K.W. was in special education classes, had cognitive delays, and was in the borderline range of intellectual functioning, which

18

used to be called "mental retardation." Nestheide testified that people in K.W.'s intelligence range tend to be naïve, gullible, and have difficulty understanding the intentions of others. *See State v. Bohannon*, 1st Dist. Hamilton No. C-880004, 1989 Ohio App. LEXIS 831, 3 (Mar. 15, 1989) (psychologist's report evaluating extent of victim's developmental delays is "sufficient evidence to permit reasonable minds to reach different conclusions as to whether the victim's ability to appraise the nature of or control her conduct was substantially impaired"); *State v. Joseph* , 1st Dist. Hamilton No. C-840751, 1985 Ohio App. LEXIS 6953, 8-9 (July 24, 1985) ("[a] finding of mental retardation * * * could logically lead one to believe that a person * * * is substantially impaired" under R.C. 2907.03.).

{¶66} K.W.'s I.Q. was 66 in 2003 and 76 by 2019. Dreyer and Nestheide agree that K.W. has borderline intellectual functioning. Additionally, K.W., who was in her 30s, had never lived independently. Her "constellation of physical conditions" required regular support. K.W. received services through DDS at least until the age of majority and became eligible for DDS services again in August 2019. K.W. testified that her DDS services should never have been discontinued. And the Mayerson Center does not evaluate normally functioning adults.

{¶67} Dreyer testified that K.W. could consent to sex. Nestheide testified that she could not. This case truly was a battle of the experts. Sufficient evidence supported K.W.'s lacking the capacity to consent to sexual activity.

<u>Gasper had knowledge of K.W.'s substantial impairment</u>

{¶68} A person acts with "knowledge of circumstances when [he] is aware that such circumstances probably exist." R.C. 2901.22(B). When a defendant's "knowledge of the existence of a particular fact is an element of an offense, such knowledge is

19

established if [the defendant] subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." *Id.* A defendant's knowledge "may be reasonably inferred from a combination of the victim's demeanor and others' interactions with the victim." (Citations omitted.) *Jordan*, 1st Dist. Hamilton Nos. C-210198 and C-210199, 2022-Ohio-1512, at ¶ 16, quoting *State v. Foster*, 2020-Ohio-1379, 153 N.E.3d 728, ¶ 48 (8th Dist.).

**{¶69}** Gasper had been working for K.W's family for years when his sexual involvement with K.W. came to light. He acknowledged the challenges that K.W. faced but minimized them by emphasizing that she was an adult, contending that her family "infantilized" her, and insisting that her cognitive functioning is in the normal range.

**{¶70}** But other witnesses' testimony established that Gasper knew, or had reasonable cause to believe, that K.W.'s ability to consent was substantially impaired. The evidence, including K.W.'s testimony itself, was sufficient to support inferred knowledge. We overrule Gasper's second assignment of error.

D.  <u>Gasper's conviction was not against the manifest weight of the evidence</u>

**{¶71}** In Gasper's third assignment of error, he argues that the weight of the evidence reflected that K.W.'s ability to consent or resist was not substantially impaired.

**{¶72}** In reviewing a weight-of-the-evidence claim, this court must review "the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Bailey*,

1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *State v. Thompkins,* 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). "When evidence is susceptible to more than one construction, a reviewing court must give it the interpretation that is consistent with the judgment." *In re J.C.,* 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 20.

**{¶73}** The weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *Bailey* at ¶ 63. In reviewing a challenge to the weight of the evidence, this court sits as a "thirteenth juror." *State v. Curry*, 1st Dist. Hamilton No. C-180493, 2020-Ohio-1230, ¶ 17, quoting *Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541. But this court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *Bailey* at ¶ 63. When a jury hears testimony from competing experts with opposite opinions, such that the evidence was susceptible to multiple interpretations, the jury's verdict is not against the manifest weight of the evidence. *Garrett*, Slip Opinion No. 2022-Ohio-218, at ¶ 139.

**{¶74}** Reversing a conviction and granting a new trial should only be done in "exceptional cases in which the evidence weighs heavily against the conviction." *Id.* "The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16.

**{¶75}** The trier of fact can reasonably infer from a combination of their observation of the victim's demeanor and the defendant's or other witnesses' interactions with the victim whether a defendant knew or had reasonable cause to believe that the victim was impaired. *State v. Browder*, 8th Dist. Cuyahoga No. 99727,

2014-Ohio-113, ¶ 17. A jury is free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. *State v. Fether*, 5th Dist. Stark No. 2011-CA-00148, 2012-Ohio-892, ¶ 44. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *Id.,* quoting *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 2000 Ohio App. LEXIS 1138 (Mar 23, 2000).

**{¶76}** The jury chose to believe that K.W.'s mental condition substantially impaired her capacity to consent to sexual activity. And this is not one of those "exceptional cases in which the evidence weighs heavily against the conviction." (Internal citations omitted.) *See State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 129. The trial court did not lose its way or create a miscarriage of justice. We overrule Gasper's third assignment of error.

E. <u>The trial court did not err by permitting K.W. to testify about her dog</u>

**{¶77}** In his fourth assignment of error, Gasper argues that the other-acts evidence in which K.W. asserted that Gasper had killed her dog, Candy, should have been excluded because it was not relevant to whether K.W. had the ability to consent or resist due to a substantial mental impairment. He further argues that this evidence was prejudicial in swaying the jury against him.

**{¶78}** "Evid.R. 404(B) only applies to '[e]vidence of other crimes, wrongs, or acts' extrinsic to the charged offense and not those acts that are intrinsic to the offense." *State v. Ludwick*, 4th Dist. Highland No. 21CA17, 2022-Ohio-2609, ¶ 21, quoting *State v. Lotzer*, 3d Dist. Allen No. 1-20-30, 2021-Ohio-3701, ¶ 10.

**{¶79}** The trial court determined that the accusation that Gasper killed K.W.'s

dog was intrinsic to the offense. We agree. K.W. testified that she believed Gasper had killed Candy so that K.W. would move to Tennessee with him and because Candy barked at Gasper when he was in K.W.'s bed, which was in her parents' home. The testimony did not involve acts extrinsic to the offenses for which Gasper was accused. Instead, they involved an act that, if it occurred, would have helped facilitate Gasper's engaging in sex with K.W.

{¶80}  Gasper's fourth assignment of error is overruled.

### III.    Conclusion

{¶81}  For the foregoing reasons, we affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, P.J.,** and **KINSLEY, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.